ATTORNEY FOR APPELLANT
John F. Crawford
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 29S00-0911-CR-531

ANTHONY D. DELAROSA,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Hamilton Superior Court, No. 29D01-0704-MR-52
The Honorable Steven R. Nation, Judge

On Direct Appeal

**December 21, 2010**

**David, Justice.**

In this direct appeal, Anthony Delarosa seeks reversal of his convictions for two counts of murder and one count of conspiracy to commit murder, for which he received two sentences of life imprisonment without parole and one sentence of fifty years. Delarosa argues that the trial court's admission of alleged hearsay statements and the prosecutor's closing arguments independently constituted fundamental error, and that the evidence at trial was insufficient to sustain his convictions. We affirm the trial court.

**Facts and Procedural History**

The bodies of Rebecca Payne and her boyfriend, George Benner, were discovered in her bedroom at her house in Home Place, Indiana, around noon of April 5, 2007. Police investigation quickly focused on Toby Payne, Rebecca's estranged husband against whom she had obtained a protective order a month earlier. Rebecca, who was in the final stages of divorcing Payne, had been living apart from him with their six-year-old son.

Phone records led the police to arrest Juan Lucio, Kyle Duckworth, and Anthony Delarosa within two weeks of the murders. Lucio and Duckworth lived in Frankfort, and Delarosa lived in Zionsville. A search of Delarosa's bedroom uncovered dark-colored clothing, dark gloves, a letter purportedly from Payne,[1] a rag that smelled of a solvent often used to clean guns, and two keys. A search of Lucio's person and vehicle uncovered two keys. All four keys locked and unlocked Rebecca's front door. Delarosa was charged with two counts of murder and one count of conspiracy to commit murder, all Class A felonies. The State requested life sentences without parole for the two murder charges.

Duckworth testified at Delarosa's trial pursuant to a plea agreement.[2] Tara Cassada, Lucio's girlfriend, and Erica Tamayo, Duckworth's girlfriend, also testified. Lucio, Duckworth, Cassada, and Tamayo socialized together frequently, and the two boyfriends often confided in their girlfriends. Cassada was granted "use immunity" to testify.[3]

Cassada testified that sometimes in the fall of 2006, Payne began making plans with Lucio to kill Rebecca to get full custody of their son, and he gave Lucio a key and a map to Rebecca's house. Lucio originally planned to do the shooting himself, but hired Delarosa

---

[1] At trial, the handwriting expert opined that it was "highly probable" that Payne had written the letter found in Delarosa's bedroom. In the letter, Payne said he had been trying to get in contact with Delarosa, asked him to look him up, because they "need[ed] to talk." "Lucio" and Lucio's cell phone number were written on the letter in a different handwriting and color ink.

[2] Duckworth pleaded guilty to assisting a criminal and received a four year sentence for his role in the murders. This sentence was to be served concurrently with another sentence for assisting a criminal arising from his role in an unrelated crime. The investigating officer testified at trial that when she approached Duckworth about a plea, the information she had did not indicate his involvement in the conspiracy, but only that he knew about the murders after they happened.

[3] Cassada agreed to testify to avoid any charges that may have arisen out of her knowledge of and minimal involvement in the conspiracy.

because "he would go in and be out quick." Lucio and Delarosa would then split Rebecca's $100,000 life insurance policy.

Duckworth testified that in late March or early April of 2007, Lucio asked him to help with the shooting. They were not to harm Payne's son, but would kill George if he was there. Duckworth would be the driver, and he would receive $200 or a quarter pound of weed for his involvement.

On the evening of April 2, 2007, Duckworth picked up Lucio and Delarosa, and the trio drove to a parking lot behind Rebecca's house. Lucio gave a gun to Delarosa and instructed him where to go. Delarosa left the car, returned about 20 minutes later, said nobody was home, and gave the gun back to Lucio.

Two days later, on April 4, the trio tried again. Duckworth picked up Lucio from his home in Frankfort and Delarosa from his home in Zionville.[4] Duckworth drove to the same parking lot, and Lucio again gave the gun to Delarosa, who left the car around 9:00PM. Duckworth moved his car to a different spot, prompting a cell phone call from Delarosa about 20 minutes later asking where they were. When Delarosa returned to the car, he said, "they're done," and recounted how he walked in on George performing oral sex on Rebecca in her bedroom. Delarosa said he emptied his clip, shot them both, and left her body on the bed and his body on the floor. Cassada and Tamayo both testified as to what their respective boyfriends said Delarosa said that evening. On the way home, at 9:41PM, Duckworth was pulled over because his license plate light was out. The officer knew and recognized Delarosa, who was sitting in the back seat of the car, and testified that Delarosa was wearing dark-colored clothing.

Forensics experts confirmed that Rebecca died from a gunshot wound to the head and that George died from a gunshot wound to the chest. They opined that the smearing and pooling of blood on the bed and on the floor, as well as the characteristics of the entry and exit wounds, were consistent with George performing oral sex on Rebecca when they were shot.

---

[4] At trial, Duckworth misidentified Delarosa as living in Whitestown. The police recovered Rebecca's keys at Delarosa's residence in Zionsville. On the night of the shooting, Lucio placed a call to Payne's cell phone and a call to Delarosa's cell phone while hitting on a tower in Brownsburg located less than two miles away from Delarosa's residence, from 8:52 to 8:53PM. While receiving Lucio's call, Delarosa's cell phone hit on the same tower.

Phone records confirmed a large amount of communication between Payne, Lucio, Duckworth, and Delarosa leading up to and following the murder, and allowed the officers to track the movements of the cell phones. The three days before the protective order was served on Payne, February 26–28, 2007, Lucio placed one call to Payne and two calls to Delarosa. On March 1, Lucio placed four phone calls to Payne and one to Delarosa. The following day, Lucio placed three calls to Payne and six to Delarosa. Records from April 2, the day of the first attempt, showed eleven calls between the four. On April 4, Lucio's cell phone "hit on"—i.e., utilized—a tower in Frankfort from 11:39AM to 8:12PM. From 8:27PM to 8:29PM, Lucio's cell phone hit on a tower in Thorntown. At 9:27PM, both Lucio and Delarosa's cell phones hit on a tower in Home Place located about half-a-mile from Rebecca's home. This hit corresponded with a call Delarosa placed to Lucio at 9:27PM. Lucio's cell phone then hit on towers in Brownsburg, from 9:50PM to 9:53PM, and in Frankfort, at 10:14PM. Phone records for April 5, the day the bodies were discovered, showed twenty calls between the four. On April 11, during the officers' interviews of Cassada and her mother, Lucio and Delarosa exchanged six text messages and one phone call.

A cellmate who was with Payne and Delarosa at the Hamilton County Jail testified that when Delarosa arrived at the cell block, Payne was already there. Delarosa said to Payne, "You got me hit on my cell phone." A few days later, the cellmate overheard Delarosa asking Payne, "Where is the money?"

The jury found Delarosa guilty on all three counts. At the sentencing hearing, Delarosa waived his right to a jury. The trial court found that Delarosa qualified for sentences of life without parole (LWOP) for the murder counts, and imposed consecutive LWOP sentences. The trial court imposed a sentence of fifty years for the conspiracy count, and ordered that to be served consecutively to the LWOP sentences.

In this direct appeal, Delarosa challenges his convictions, arguing that: 1) Lucio's statement to Cassada and Duckworth's statement to Tamayo about the shooting after it occurred were hearsay because these statements were not in furtherance of the conspiracy and admitting these statements constituted fundamental error; 2) during closing arguments, the prosecutor

4

committed misconduct by inappropriately commenting on Delarosa's failure to testify at trial; and 3) the evidence was insufficient to convict Delarosa of the murder charges.

## I. Lucio's Statement to Cassada, Duckworth's Statement to Tamayo

Delarosa contends the statements Lucio and Duckworth made to their girlfriends after the shooting of Rebecca and George were inadmissible hearsay. Delarosa concedes that he failed to object to the relevant portions of Cassada and Tamayo's testimonies at trial, but argues that the "wholesale admission of statements of co-conspirators that were not made 'during the course and in furtherance of the conspiracy' constitutes fundamental error." Even assuming—without deciding—that the statements were hearsay, we find there is no fundamental error.

A failure to object when the evidence is introduced at trial waives the issue for appeal. Jackson v. State, 735 N.E.2d 1146, 1152 (Ind. 2000). But a claim waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006). The error claimed must either "make a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process." Clark v. State, 915 N.E.2d 126, 131 (Ind. 2009). This exception is available only in "egregious circumstances." Brown v. State, 799 N.E.2d 1064, 1068 (Ind. 2003). This doctrine has been applied, for example, to review a conviction without proof of an element of the crime despite the lack of objection. Smith v. State, 459 N.E.2d 355, 357 (Ind. 1984).

Here, Delarosa argues the portions of the girlfriends' testimonies which recounted their boyfriends' statements as to what happened the night of the shooting were "substantially damaging" because it corroborated Duckworth's account at trial. Because Duckworth "was a witness of dubious credibility," Delarosa contends that "there exists a substantial question as to whether the jury would have convicted Delarosa of [murder] based solely on Duckworth's questionable testimony."

But the jury did not convict Delarosa of murder "based solely on Duckworth's questionable testimony." Duckworth's testimony regarding what Delarosa said when he returned to the car was clearly admissible. His testimony corroborated with the testimonies of unchallenged witnesses and with the other evidence introduced at trial. Duckworth's testimony about Delarosa describing the shooting was consistent with the crime scene and forensic experts' testimonies. The State presented phone records that showed a spike in communication between Payne, Lucio, Delarosa, and Duckworth from when the protective order was served on Payne to when the bodies were discovered. These records placed Delarosa near the scene of the crime and corroborated Duckworth's testimony that he had moved his car and Delarosa called Lucio after the shooting to ask where they were. There was no issue as to whether the State obtained the coconspirators' cell phones and phone records lawfully, and no issue as to who owned the phones.

Other evidence bolstered the State's case. The officer who pulled Duckworth over shortly after the shooting recognized Delarosa, who was wearing dark-colored clothing, in the backseat of Duckworth's car. A warrant search of Delarosa's bedroom uncovered incriminating evidence, including keys that matched Rebecca's front door and a rag that smelled like it may had been used recently to clean a gun. The Hamilton County Jail cellmate's testimony, viewed in context of the phone records and Cassada's testimony that Lucio brought Delarosa on to do the actual shooting, independently linked Delarosa to the shooting.

The claimed error did not make a fair trial impossible. Nor was its harm or potential harm substantial. As further discussed in Part III, there was ample evidence pointing to Delarosa as the shooter. Cassada and Tamayo's challenged testimonies did not add anything of consequence to what Duckworth already testified. Their testimonies did not result in the admission of additional pieces of evidence. All the witnesses were subject to rigorous cross examinations. A thorough review of the transcript suggests trial counsel was competent in preserving objections and protecting the record. In short, the claimed error does not rise to the level of fundamental error.

## II. Prosecutorial Misconduct

Defendant contends the following statement during the State's closing arguments was prosecutorial misconduct:

> [State:]      [Delarosa] said that these were all tainted conclusions. All of these things you heard from these witnesses were tainted. And remember in the words of Ronald Reagan and one of the prospective jurors even said this, trust but verify. And that's exactly what the State has done for you. We aren't saying just trust [Duckworth.] We aren't saying just trust [Cassada.] We're giving you the tools with which to do that. Trust but verify. Their testimony is not the meat on bare bones. To believe that would be to ignore almost 100 exhibits and to ignore the testimony of the other witnesses. And what about believing Delarosa himself. It would have been great if he had admitted to this officer—

At this point, Delarosa objected, apparently on the basis that this was a comment on his silence:

> [Delarosa:]      Your Honor, I have to object. Making a comment—
>
> [State:]      If I may continue?
>
> The Court:      You may.
>
> [State:]      He admitted to [Duckworth,] he admitted to [Lucio,] and he admitted to [his cellmate] when he implied coming into that room, coming into that cell block, and he said you got me hit on my cell phone. He knew by then how they had found them because his cell phone was there and he was outside of that car when he made that call to [Lucio.] He was outside of that car. Believe him himself.

Specifically, Delarosa claims that the comment, "it would have been great if he had admitted to this officer" requires reversal of his convictions.

In reviewing claims of prosecutorial misconduct, "we consider first whether the prosecutor committed misconduct and second, whether the alleged misconduct placed the defendant in grave peril." Robinson v. State, 693 N.E.2d 548, 551 (Ind.1998). "The gravity of

7

the peril is determined by considering the probable persuasive effect of the misconduct on the jury's decision, rather than the degree of the impropriety of the conduct." Willoughby v. State, 660 N.E.2d 570, 582 (Ind. 1996). To preserve a claim of prosecutorial misconduct, a defendant must object and request an admonishment. Robinson, 693 N.E.2d at 552. If the defendant is not satisfied with the admonishment, the defendant must move for a new trial. Id. Failure to comply waives the prosecutorial misconduct claim. Id.

Delarosa failed to comply with the procedure to preserve the prosecutorial misconduct claim. Even if Delarosa preserved the claim, he failed to demonstrate that he is entitled to relief. "The Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence." Moore v. State, 669 N.E.2d 733, 739 (Ind. 1996). In context, the State's statement was not a reference to Delarosa's failure to testify at trial. Rather, the prosecutor is suggesting that officers did not need to obtain a confession from Delarosa because he had already confessed to Duckworth, Lucio, and his cellmate. The State's statement was way too attenuated to warrant reversal, even if the claimed error had been properly preserved. Nicks v. State, 598 N.E.2d 520, 524 (Ind. 1992) (rejecting defendant's argument "that the testimony that he was interviewed implied, by the absence of anything further, that he had invoked his right to remain silent"). It therefore follows that the claimed error does not rise to the level of fundamental error.

### III. Sufficiency of Evidence

Delarosa challenges the sufficiency of the evidence to support his murder convictions. Specifically, Delarosa argues the evidence merely establish that he was "present" at the scene of the shootings, and that "[a]ny of the three persons in [Delarosa's car] on the evening of April 4, 2007 could have killed [the victims.]"

The standard of review for sufficiency-of-evidence claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and respect "the jury's exclusive province to weigh conflicting evidence." Alkhalidi v. State, 753 N.E.2d 625, 627 (Ind. 2001). We "consider only the probative evidence and reasonable inferences supporting the verdict." McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We affirm "if the probative evidence and

8

reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." Tobar v. State, 740 N.E.2d 109, 111–12 (Ind. 2000).

To convict Delarosa of the murder charges, the State was required to prove that Delarosa "knowingly or intentionally" killed Rebecca and George. Ind. Code § 35-42-1-1(1) (2004). In addition to placing Delarosa at the scene of the crime, the evidence could have allowed a jury to conclude that Delarosa was the shooter. Evidence at trial showed that Delarosa knew both Payne and Lucio for several years. A letter uncovered from Delarosa's bedroom suggested that Payne knew Delarosa and was trying to get in touch with him. Phone records showed numerous calls between Payne, Lucio, Delarosa, and Duckworth on March 1–2 (the days after Payne was served with the protective order), April 2 (the day of the first attempt), April 4 (the day of the shooting), April 5 (the day the bodies were discovered), and April 11 (the day the police showed up at Lucio's house to question Lucio, Cassada, and Cassada's mother). These phone records suggest that Delarosa was an active member in the conspiracy to kill Rebecca.

Delarosa told Duckworth that he walked in on the victims and shot them as they engaged in oral sex in Rebecca's bedroom. Duckworth's testimony was corroborated by the testimonies of Cassada, Tamayo, the crime scene investigators, and the forensics experts. The phone records further supported Duckworth's testimony by showing that Lucio's phone traveled from Frankfort to Brownsburg to Home Place and back again to Frankfort over a two-hour span that evening. At 9:27PM, both Lucio and Delarosa's cell phones hit off a tower near Rebecca's home, corroborating Duckworth's testimony that Delarosa called Lucio after the shooting to determine their whereabouts.

The officer who pulled Duckworth over on the way home from the shooting testified that Delarosa was wearing dark-colored clothing. A search of Delarosa's bedroom uncovered—lying in close proximity to each other—dark-colored clothing, gloves, keys to Rebecca's door, and a rag that smelled like it may had been used recently to clean a gun. Mere presence at the scene of the crime does not explain why Delarosa had keys to Rebecca's door. The cellmate's testimony as to Delarosa's statements to Payne, "You got me hit on my cell phone," and, "Where is the money," further suggest that Delarosa was not merely "present" but was the actual shooter.

9

As the State succinctly concluded in its brief:

> Defendant's argument that Duckworth's testimony should not be credited is simply a request for this Court to reweigh the evidence. The jury heard all these same claims about how Lucio was the real killer and Duckworth was just lying. It was for the jury to decide what to believe or disbelieve.

The evidence could have allowed the jury to conclude, beyond a reasonable doubt, that Delarosa shot and killed Rebecca and George on April 4, 2007. The evidence was sufficient to convict Delarosa of the two murders.

## Conclusion

Delarosa's convictions and sentences are affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.