Antonio Gonzalez **VAZQUEZ,**
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 09A05–1008–CR–466.**

Court of Appeals of Indiana.

Feb. 18, 2011.

Transfer Denied April 6, 2011.

Matthew D. Barrett, Matthew D. Barrett, P.C., Logansport, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Antonio Gonzalez–Vazquez appeals his convictions following a bench trial for criminal confinement as a class B felony;[1] stalking as a class D felony;[2] and theft as a class D felony.[3]

We affirm.

### ISSUES

1. Whether Vazquez's appearance in jail clothing violated his due process rights.
2. Whether the trial court abused its discretion in admitting evidence.

### FACTS

Maricruz Cervantes and Erika Howard, both residents of Logansport, met Vazquez in May of 2009 at an Indianapolis dance club. Before Cervantes and Howard left for the night, Cervantes and Vazquez made plans to "hang out with each other in Indianapolis sometime...." (Tr. 21).[4] Cervantes and Vazquez subsequently began dating. Vazquez would drive to Logansport from Indianapolis at least once a week to visit Cervantes.

At the end of October of 2009, however, Cervantes ended her relationship with

Vazquez because he was "trying to control [her] life and know everything about [her]." (Tr. 53). Although Vazquez agreed they "weren't going to look for each other," he continued to call or text messages to Cervantes "[a]t least once a day, every day." (Tr. 54). Cervantes asked him to stop, "but he kept calling so [she] just ignored the calls" and text messages from Vazquez. (Tr. 55).

Cervantes then began to notice that Vazquez "would be parked outside [her] work" place, and she "would see him drive around [her] house and at the park," where she took her son to play. (Tr. 58). On one occasion, officers arrested Vazquez for an unrelated offense as he sat outside her place of work. In December of 2009, Vazquez followed Cervantes and some of her friends to Indianapolis. During the drive back to Logansport, Vazquez "tried to run [them] off the road and hit [Cervantes'] friend's van." (Tr. 63).

On January 23, 2010, Cervantes and Howard planned to go to a dance club in Lafayette. As they were getting ready, Cervantes received a text message from Vazquez. Howard became worried about driving to Lafayette due to the incident in December, when Vazquez had tried to force Cervantes off the road. Howard therefore arranged to drive to Lafayette with two male friends.

When Cervantes, Howard, and their male friends arrived at the club, they noticed that Vazquez was there. At some point in the evening, Cervantes and Howard sat with a large group, which included Vazquez. Howard told Vazquez to leave Cervantes alone.

---

**1.** Ind.Code § 35–42–3–3.

**2.** I.C. § 35–45–10–5.

**3.** I.C. § 35–43–4–2.

**4.** All citations to the transcript are to Volume 5.

Howard and Cervantes left the club at approximately 3:00 a.m. While they were in the parking lot, Vazquez telephoned Howard and asked where they were. Howard lied, telling him that they were "on the road already" because she "didn't want him following" them. (Tr. 32).

When they arrived in Logansport, Cervantes dropped off Howard. Before Howard went inside, she noticed that Vazquez's vehicle was parked "[d]own the road from [her] house." (Tr. 34). Vazquez then began following Cervantes as she drove away. Howard sent Cervantes a text message, warning her that Vazquez was following her. Howard "waited for her text back but [she] eventually fell asleep . . . ." (Tr. 34).

After dropping off Howard, Cervantes drove home. During the drive home, she was talking on her cell phone and therefore did not get Howard's text message. When Cervantes got home, she parked in front of her house and exited her vehicle. As she walked toward her house, Vazquez "came out of nowhere and just attacked [her]." (Tr. 71). He "came from behind" and covered her mouth with one hand. (Tr. 72). He put his arm around her neck and "pulled [her], dragged [her] down the block . . . ." (Tr. 73). As he did so, he told Cervantes that "[she] made [him] do this," (tr. 72); "[h]e wasn't going to let [her] go"; and "[h]e wasn't going to let [her] live." (Tr. 73).

Vazquez proceeded to drag Cervantes to his car and tried to push her inside. As Cervantes resisted, Vazquez struck her face. After a struggle, Vazquez forced Cervantes into the passenger seat, shut the door and then walked around to the driver's side door. Before he got into the car, Cervantes "opened the passenger side door and [she] took a run for it," back toward her house. (Tr. 76). Vazquez ran after her. After catching Cervantes, he "grabbed [her] by [her] head and started hitting on [her] head and dragging [her] at the same time back to his car." (Tr. 76).

Once Vazquez got Cervantes back to his vehicle, he grabbed her by the neck and tried to force her into the car. At one point, he forced Cervantes head onto the floor board and started pressing on her neck with his hands, causing Cervantes to lose consciousness. When Cervantes regained consciousness, she was inside the car. Vazquez then "grabbed [her] purse and threw it back in the car" before "crawl[ing] over [her]" to get in the the driver's seat. (Tr. 79).

Vazquez drove toward Indianapolis, "driving crazy[.]" (Tr. 80). Cervantes twice grabbed the ignition key, after which Vazquez pushed her. Finally, Vazquez stopped the car when Cervantes said she wanted to talk. Vazquez told Cervantes that he wanted to be with her; start a family with her; and move away with her. When Cervantes told Vazquez that she could not leave without her son, he agreed to take her back home to get him.

On the way back to Logansport, Vazquez stopped at a gas station. Although Vazquez got about six gallons of gas, he failed to pay the approximately thirteen dollars for the gas. He then drove Cervantes to her house. He told her that he would give her five minutes to get her son, get her truck and meet him on the corner. He then dropped off Cervantes, threatening her if she did not return.

When Cervantes got inside of her house, she told her mother what had transpired. Cervantes' mother telephoned 9–1–1. Cervantes gave the responding officers a description of Vazquez and his vehicle. She also gave the officers a copy of a summons issued by the Cass County Sheriff's Department to Vazquez for operating

a vehicle without a license; Vazquez had given her the summons for assistance in translating it.

Officers subsequently located Cervantes' cell phone near where she had dropped it during her struggle with Vazquez. When Cervantes turned on her cell phone, she "noticed all the messages that [Vazquez] had written [her] from the time [she] left Lafayette at three o'clock till he did what he did . . . ." (Tr. 99). The text messages asked where she was, "did [she] want to meet him, if [she] wanted to see him, telling [her] he was by . . . [her] house or . . . [Howard]'s house." (Tr. 100).

Officers attempted to locate Vazquez by using a tracking device on his cell phone. When they were unsuccessful, they set up a ruse. An interpreter with the prosecutor's office telephoned Vazquez on his cell phone, posing as a friend of Cervantes, visiting Indianapolis. "She indicated that she wasn't familiar with the whole situation. She just knew that she was to pick up a purse from Mr. Vazquez and bring that back to Logansport." (Tr. 155). When Vazquez arrived for the meeting, he had Cervantes' purse with him and was immediately arrested and taken into custody.

On February 1, 2010, the State filed several charges against Vazquez. On May 6, 2010, the State filed an amended information, charging Vazquez with Count I, criminal confinement as a class B felony; Count II, stalking as a class C felony; Count III, strangulation as a class D felony; and Count IV, theft as a class D felony.

The trial court held a bench trial on May 12, 2010 after Vazquez waived jury trial. Vazquez appeared wearing jail clothing. Cervantes testified to the foregoing and unequivocally identified Vazquez as the perpetrator. In addition, Cervantes testified as follows:

[State]: Is the person who did this to you and stalked you and dragged you from your house, confined you and strangled you here in the court room here today?

A Yes, he is.

Q Can you identify the defendant?

A Yes, I can.

Q What is he wearing?

A He is wearing orange and sitting across from me.

(Tr. 110).

Detective Robert C. Smith of the Logansport Police Department testified that in attempting to locate Vazquez, he contacted the service provider for Vazquez's cell phone and "requested a tracking device be placed on the phone." (Tr. 146). He further testified that despite receiving frequent reports of Vazquez's whereabouts in Logansport and Indianapolis, they could not locate him.

Although the State offered testimony regarding the use of the tracking device, the State did not offer, and therefore the trial court did not admit, into evidence any writings or recordings related to the tracking information. The State also did not seek to admit into evidence the text messages about which Cervantes and Howard testified.

The trial court found Vazquez guilty of criminal confinement as a class B felony; stalking as a class D felony, as a lesser-included offense of class C felony stalking; and theft as a class D felony. Following a sentencing hearing on July 19, 2010, the trial court sentenced Vazquez to a total sentence of twenty-six years.

Additional facts will be provided as necessary.

## DECISION

### 1. Jail Clothes

 Vazquez asserts that his appearance in jail clothes during the bench trial denied him due process. We disagree.

Under the Fourteenth Amendment to the United States Constitution, a defendant cannot be compelled to appear before a jury in identifiable prison clothing because this may impair the presumption of innocence. In determining whether a defendant was compelled to stand trial wearing jail clothing, "we must focus upon what actions the accused and his attorney took to alleviate what they now see as a problem." Moreover, the failure to object to being tried in jail clothes "negates the compulsion necessary to establish a constitutional violation." *Bronaugh v. State*, 942 N.E.2d 826 (2011) (internal citations omitted).

Here, there is no evidence that the trial court compelled Vazquez to wear jail clothes. In fact, during pre-trial conference held on April 26, 2010, to discuss jury procedures, the trial court instructed Vazquez's counsel to provide him with civilian clothes. The trial court then set the jury trial for May 12, 2010, giving Vazquez over two weeks to obtain clothing. Vazquez, however, subsequently waived his jury trial, and at no point during the bench trial did he object to wearing jail clothes. Finding no compulsion, we cannot say that the wearing of jail clothes constituted a violation of Vazquez's due process rights.

 "Recognizing that no objection was raised," however, "Vazquez contends that his appearance in jail clothing constituted fundamental error...." Vazquez's Br. at 12. Again, we cannot agree.

Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process ... present[ing] an undeniable and substantial potential for harm." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).

Here, Vazquez did not appear before a jury in the jail clothes; rather, he was tried by the trial court. We presume trial judges to be impartial, and Vazquez has not demonstrated otherwise. *See Perry v. State*, 904 N.E.2d 302, 307 (Ind.Ct.App. 2009) (stating that the law presumes that the judge is unbiased and unprejudiced), *trans. denied*. We therefore agree with the State that the rationale for prohibiting the trial court from denying a defendant the right to wear civilian clothes during a jury trial does not apply, where his appearance in jail clothes did not impede his presumption of innocence. Accordingly, we find no fundamental error.[5]

### 2. Admission of Evidence

 Vazquez also asserts that the trial court abused its discretion in admitting evidence. Specifically, Vazquez argues that the trial court abused its discretion in admitting testimony regarding text messages and the use of a cellular tracking device without first authenticating the text messages and tracking information pursuant to Indiana Evidence Rules 901(a). Vazquez also argues that the trial court improperly admitted testimony regarding

---

5. Vazquez also argues that appearing in jail clothes before witnesses impeded the presumption of innocence "since the central controversy was the *identification* of Vazquez as the perpetrator." Vazquez's Br. at 12. We find no merit in this contention as the record clearly shows that Vazquez's identification was not at issue.

Vazquez's prior bad acts, namely forcing Cervantes' vehicle off the road and "being arrested for driving without a license and other unknown offenses," (Vazquez's Br. at 15); Cervantes' testimony identifying Vazquez as the person who committed the crimes against her; and certain hearsay statements.

■ Generally, the admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse the trial court's determination only for an abuse of that discretion. *Redding v. State*, 844 N.E.2d 1067, 1069 (Ind.Ct.App.2006). In this case, however, Vazquez failed to object to the admission of any of this evidence. Thus, he has failed to preserve his challenges to its admissibility. *See Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010).

■ Nonetheless, "a claim waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Id.* Again, the fundamental error exception is extremely narrow and "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.* We apply the exception only in egregious circumstances, such as where there has been "a conviction without proof of an element of the crime despite the lack of objection." *Id.* at 695.

The record shows that Cervantes testified extensively regarding the events of the morning of January 24, 2010. She also testified that after she ended her relationship with Vazquez, he sent her several unwanted text messages and would often show up at her home and place of work uninvited. Given this testimony, we do not find that the admission of the uncontested evidence constituted fundamental error, if error at all.

Affirmed.

NAJAM, J., and BAILEY, J., concur.