## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 27 2017, 5:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William A. Paz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 27, 2017

Court of Appeals Case No.
79A05-1603-CR-697

Appeal from the
Tippecanoe Superior Court

The Honorable
Randy J. Williams, Judge

Trial Court Cause No.
79D01-1501-MR-1

**Kirsch, Judge.**

[1] Following a jury trial, William A. Paz ("Paz") was convicted of murder,[1] a felony, and obstruction of justice,[2] a Level 6 felony. Paz now appeals, raising the following restated issues:

    I.     Whether the State's questions, which Paz contends referred to his pre-arrest silence, constituted fundamental error; and

    II.    Whether it was fundamental error for the trial court to admit statements made by Paz that were translated by a non-certified interpreter.

[2] We affirm.

## Facts and Procedural History

[3] On January 5, 2015, Paz was arrested in Lafayette, Indiana and charged with obstruction of justice and with the murder of Primativo Flores ("Flores").[3] The events leading to that arrest were as follows. On December 18, 2014, Flores had travelled by bus from Chicago, Illinois to Lafayette to start his new job as a dishwasher for Teppanyaki Grill ("Teppanyaki").[4] A Teppanyaki employee, driving a white van, picked up Flores at the bus station and drove him to what

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 34-44.1-2-2.

[3] The pathologist who performed the autopsy referred to the victim as Primativo Flores Martinez. *Tr.* at 78.

[4] In the probable cause affidavit, the name of this restaurant is spelled as "Teppanyaki," but in the transcript, as "Tepinyaki." *Appellant's App.* at 14; *Tr.* at 18-19. The restaurant name was never spelled for the record; however, assuming that the investigating officer was correct, we use the spelling from the probable cause affidavit.

would be his housing at the Brampton Apartments. Teppanyaki housed at least ten of its employees in two Teppanyaki-supplied apartments, one in the Brampton Apartments and the other in the Emerald Pines Apartments. Six employees lived in the two-bedroom apartment at the Emerald Pines, including Paz and his roommate, Juan Alberto Imel Pop ("Pop"), both of whom slept in the living room. Spanish was the native language of Paz, Pop, and Flores.

[4] Each day, a Teppanyaki manager, driving the white van, would pick up the employees, drive them to work, and drive them back to the apartments at the end of their twelve-hour shifts. While at work, employees were not referred to by their given names; instead, their job titles served as names—Paz was known as "hibachi," Pop was known as "the cutter," and Flores was known as "the dishwasher." *Tr.* at 290, 293, 418, 447-48.

[5] After work on December 24, 2014, Paz and Pop bought beer from a local liquor store and returned to their apartment to drink. The men drank until around 2:30 a.m. At that time, Paz, who owned a silver Ford Expedition, drove the two men, first, to a gas station to pick up more beer and, then, to a party at the Brampton apartment. Upon arriving, Pop saw four fellow employees; Pop did not know the name of one of the men, who was later identified as Flores. During the evening, Flores asked Pop if he was part of a gang. When Pop said no, Flores began to move his fingers, showing Pop how "they greet as a gang." *Id.* at 372. Upon seeing Flores's fingers, Paz interrupted, saying, "I know what he means," and started to greet Flores by moving his fingers just as Flores had done. *Id.* Paz and Flores began to talk, and Paz told Flores that he was part of

a gang, had killed people before, and was a "Coronado," or king, in El Salvador. *Id.* at 373. Flores said that he was also "part of a gang. I have my friends in Chicago." *Id.* at 373-74. The conversation continued, and Paz became angry when Flores stood right in front of him and said that he too was the king, or "Coronado," of his gang. *Id.* at 374-75. A fight began, but Pop intervened, and things calmed down. Paz and Flores continued drinking, and later, Flores asked Paz to take him to Chicago.

[6] Before driving to Chicago, Paz, Pop, and Flores returned to the Emerald Pines apartment, intending to drop off Pop. Upon reaching the apartment, however, Flores asked for a beer, and all three men went into the living room of the apartment and began drinking beer together. Inside, Flores and Paz, again, began talking about gangs. This led to a heated argument between Paz and Flores about who was toughest and most powerful. Pop again intervened, but his pleas for Paz and Flores to calm down went unheeded. By this time, Pop was feeling sick from the alcohol, and he went into the bathroom, where he stayed for three or four minutes. When Pop returned to the living room, he found Paz with one hand around Flores's neck and the other holding a knife to Flores's chest. Pop saw Paz stab Flores multiple times in the chest, and when Flores fell to his knees, Paz stabbed Flores in the face. Flores then slumped to the floor and did not move. Flores died from the stab wounds, some of which had punctured his heart and lungs. Paz waited for Flores to stop bleeding and then wrapped his body in one of Pop's blankets and loaded Flores's body into the Expedition.

[7] After dumping Flores's body along U.S. Highway 52 in Lafayette, Paz returned to the Emerald Pines apartment. Pop saw Paz grab his clothes by the armful and remove his television from the apartment. When Pop learned that Paz was going to Indianapolis, where his sister lived, Pop assumed that Paz had loaded his belongings into the Expedition. Pop went to sleep, and by the time he awoke a few hours later, Paz was gone. Pop went to work on the morning of December 25, 2014, but left Teppanyaki early, around 4:00 p.m., and returned to the Emerald Pines apartment to clean Flores's blood from the living room floor. Pop had not mentioned the murder to any of his coworkers. Pop packed his belongings, and he moved from Indiana that evening and went to work at a restaurant in Ohio. Police, following the leads in the case, later tracked Pop to Ohio and returned him to Indiana. *Tr.* at 282-84, 410-11. Pop testified to the above facts at trial.

[8] On the morning of December 25, 2014, Flores's body was discovered on the side of the road by a motorist, who called the Lafayette Police Department ("LPD"). On Flores's body, police found a bus ticket, but nothing to suggest his identity. When Flores's body was examined, it was discovered that, in addition to the stab wounds, he had suffered multiple blunt force traumas and cuts to his fingers and hands, plus he had a blood alcohol content of .38. In the absence of Flores's identification, police used the bus ticket and a surveillance video, showing Flores's initial ride from the bus station in Teppanyaki's white van, as a lead. From that evidence, police discovered that Teppanyaki owned the white van, and that the victim had been an employee of Teppanyaki.

[9] Following that lead, the police went to Teppanyaki on December 27, 2014 to pursue leads concerning Flores's identity and whereabouts prior to the murder. Paz had returned to Lafayette and was working at Teppanyaki that day. Initially, the officers spoke with Rich, the manager of Teppanyaki. Rich, knowing that Paz had been at the restaurant for a while, and suspecting that he knew most of Spanish-speaking employees, introduced Paz to the officers as "hibachi"; the only name by which Rich knew Paz. *Tr.* at 162. Because Paz spoke Spanish, and the officers were not fluent in Spanish, they called in Nirvana Grant ("Grant"), an LPD dispatcher who was fluent in Spanish and was frequently called upon to interpret for the LPD.

[10] Once Grant arrived at Teppanyaki, the officers interviewed Paz. LPD Detective Daniel Long ("Detective Long"), testified that Paz was not a suspect during that interview; instead, the goal of the interview was to determine the decedent's identity. *Id*. at 163-64. At one point in the Teppanyaki interview, Detective Long started to record the interview on an "electronic device." *Id*. at 163. The recorded portion of the interview was introduced at trial as State's Exhibit 32, and a transcript of that recorded language, labeled, "State's Exhibit 132," was published to the jury "for the purposes of assisting [the members] while they listened to the audio."[5] *Id*. at 179. The police showed Paz a photograph of Flores and, with the assistance of Grant's translation, asked Paz

---

[5] The jury understood that State's Exhibit 132 could only "be offered for demonstrative purposes to assist the jury" because, as the trial court noted, "the best evidence is what you hear." *Tr*. at 179.

where Flores lived. Paz responded that Flores did not live in Paz's apartment. He also stated that he knew the man by face but did not know his name or where he was living. When asked whether Flores spoke English, Paz said that Flores had just been at Teppanyaki for two or three days, and Paz had not talked to him. Paz initially stated that, on the night of December 24, 2014, he was in his Emerald Pines apartment drinking with Pop. When asked if Flores had ever been to Paz's apartment, Paz stated that Flores had also been in his apartment drinking on the night of December 24, 2014. Paz's version of events "changed several times and quickly." *Id*. at 166. LPD Detective Mark Pinkard ("Detective Pinkard"), who was leading the interview, then asked if Paz would be willing to speak with them at the police station. Detective Pinkard reiterated that Paz was not under arrest, and Paz agreed to go with Detective Pinkard to the station. Both parties agree that, sometime after Paz arrived at the police station, he asserted his right to remain silent and requested an attorney. *Appellant's Br*. at 16; *Appellee's Br*. at 8.

[11] A separate but simultaneous investigation led other LPD officers to the Brampton apartment and the Emerald Pines apartment, where officers waited for search warrants. A search outside the Emerald Pines apartment revealed blood on the concrete leading to the apartment door. More blood was discovered on the front door of the apartment, which, when tested, contained a mixture of Flores's and Paz's DNA. In the dumpster behind the Emerald Pines apartment, police found a bloody pair of jeans, a shirt, broken kitchen shears, a piece of carpet, and a bleach bottle. The blood on the jeans contained Flores's

DNA. Additionally, after police obtained Paz's shoes, pursuant to a search warrant, blood found inside and outside of the shoes was determined to contain a mixture of DNA from Flores and Paz. *Tr.* at 321. Flores's DNA was also found in blood located in Paz's Expedition.

[12] On January 5, 2015, the State charged Paz with obstruction of justice, a Level 6 felony, and murder. A three-day jury trial commenced on February 2, 2016, and Pop was the key witness for the State, testifying that he had seen Paz kill Flores. Paz, however, testified on his own behalf, claiming that Pop was the one who had killed Flores. Following trial, the jury convicted Paz of both counts. Paz was sentenced to a term of forty-five years for the murder conviction and a concurrent term of one year for the obstruction of justice conviction, for an aggregate sentence of forty-five years in the Indiana Department of Correction. Paz now appeals his murder conviction.

## Discussion and Decision

## I.    Pre-Arrest Silence

[13] Paz argues on appeal that "the State impermissibly used *evidence* of his right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution" and his right to counsel as substantive evidence of his guilt. *Appellant's Br.* at 18 (emphasis added). In this case, prior to trial, the trial court granted Paz's request for a motion in limine to exclude from trial any evidence pertaining to Paz's pre-arrest silence. *Tr.* at 5-8. During trial, Paz objected, twice, to the prosecutor's questions regarding his interviews with police—once

during the direct examination of Detective Pinkard, and a second time as impeachment of Paz's own testimony at trial. The trial court, effectively, sustained both of Paz's objections.[6] On appeal, Paz asserts that our court must decide whether Paz was denied the right to a fair trial when the prosecutor admitted evidence about his pre-arrest silence at trial. *Appellant's Br*. at 18 (citing to standard of review for admission of evidence). We reject Paz's suggestion that the instant case pertains to improperly admitted evidence, however, as no evidence was admitted about which Paz can complain. Instead, because Paz's challenge is, more precisely, directed at the prosecutor's questions that he claims referenced his pre-arrest silence, we address Paz's claim as one of prosecutorial misconduct. *Id*. at 20.

[14]     "In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected.'" *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State,* 854 N.E.2d 831, 835 (Ind. 2006)). When an improper argument is alleged to have been made, the proper procedure is to request the trial court to admonish the jury. *Cooper*, 854 N.E.2d at 835. If the objecting party is not satisfied with the admonishment, then he or she should move for mistrial. *Id*. However, failure

---

[6] In one instance, the trial court sustained Paz's objection. In the other instance, the trial court did not make a specific ruling; instead the court required the State to rephrase its question, which resolved Paz's objection.

to comply waives the prosecutorial misconduct claim. *Delarosa v. State*, 938 N.E.2d 690, 696 (Ind. 2010).

[15] Here, Paz concedes that he did not request an admonishment or move for a mistrial. *Appellant's Br*. at 20. "Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, *waived* for failure to *preserve* the claim of error." *Ryan*, 9 N.E.3d at 667. The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. *Id.* at 667-68. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Id*. at 668 (quoting *Benson v. State,* 762 N.E.2d 748, 756 (Ind. 2002)).

[16] To avoid waiver, Paz contends that the prosecutor committed fundamental error twice during trial. Paz claims that the first instance of fundamental error arose while the State was conducting its direct examination of Detective Pinkard and exploring the circumstances surrounding Paz being moved from his December 27, 2014 interview at Teppanyaki to the police station. Detective Pinkard testified that, as part of the process to identify the murder victim, the LPD had gone to Teppanyaki and had spoken with the manager, who introduced the officers to Paz. At that time, Paz was not a suspect. Detective Pinkard began the Teppanyaki interview by engaging in small talk, to put Paz at ease. Later, when the interview was being recorded by Detective Long,

Detective Pinkard showed Paz a photograph of Flores and inquired about Flores's identity and his whereabouts on the night before the murder. The jury heard the audio containing Paz's inconsistent answers and also heard Paz agree to continue the interview at the police station.

[17] The State then elicited testimony from Detective Pinkard, who said that he and Paz engaged in "chit chat" on the way to the police station. *Tr.* at 295. Detective Pinkard made clear that Paz, who sat in the front passenger seat, knew he was not under arrest. *Id.* Detective Pinkard also stated that he and Paz continued "chatting" after they arrived at the station. *Id.* at 296. As follow-up, the State asked the detective, "What kind of topics did you talk about?" *Id.* It was at that point that defense counsel objected to "the conversations they had at headquarters based on the motion in limine." *Id.* Outside the presence of the jury, defense counsel suggested that Paz would be prejudiced by this line of questioning, which would suggest to the jury that Paz exercised his right to remain silent. The State responded that evidence of the conversation between Detective Pinkard and Paz was necessary to demonstrate a comfort level that the police provided Paz, since the State anticipated that Paz might use "claimed fear of police" as part of his defense. *Id.* at 297. The trial court disagreed with the State and sustained Paz's objection. *Id.* The judge and counsel returned to the courtroom, and when questioning continued, the State did not ask Paz about the conversation at the police station. *Id.* at 298.

[18] The question posed by the prosecutor did not constitute fundamental error. Detective Pinkard testified that he and Paz chatted both on the way to the

police station and after they arrived at the station. Referring to the conversation at the station, the State asked, "What kind of topics did you talk about?" *Id.* at 296. Paz immediately objected. Paz's suggestion that the initial question would lead the jury to infer that Paz exercised his right to remain silent was only discussed outside the presence of the jury. The trial court sustained Paz's objection. The State's question did not mention or suggest that Paz ever exercised his right to remain silent. The jury heard no evidence that could have suggested that Paz was "lawyering up." *Appellant's Br.* at 14. We find no error, and certainly not fundamental error, in this encounter.

[19] The second instance about which Paz contends the prosecutor committed fundamental error arose during the State's cross-examination of Paz. At trial, Paz testified in his own defense and claimed that Pop was the one who stabbed and killed Flores. During cross-examination, the State asked Paz, "You never told police the story that you told today, correct?" *Tr.* at 469. Paz objected on the basis that the question was a violation of the motion in limine. The judge and counsel, again outside the presence of the jury, discussed Paz's objection. Defense counsel pointed out that Paz had admitted on direct examination that he had spoken with the police. Both parties agreed that Paz asserted his right to remain silent after he arrived at the police station; however, the jury was not explicitly informed of that fact. Therefore, Paz argued that a question inquiring about his interview on the night of December 27 would be prejudicial when he, in fact, exercised his right to remain silent. The prosecutor claimed that it was "absolutely clear" that the State was asking about the conversation Paz had

with Detective Pinkard at Teppanyaki. *Id*. at 470. The judge disagreed with the State's assertion and instructed the prosecutor to clarify that her question was limited to the conversation at Teppanyaki. *Id*. at 471. Paz did not object to the trial court's resolution of this issue. Returning to open court, the State asked Paz, "When talking to the police at Tep[pan]yaki, you never told them anything about the story that you told today, correct"? *Id*. at 471-72. Without objection, Paz responded, "Correct." *Id*. at 472. Here, Paz has failed to establish that the State's two questions during trial constituted prosecutorial misconduct. Accordingly, the instances about which Paz complains could not have constituted fundamental error.

## II. Translator Certification

[20]     Paz next contends that the trial court committed fundamental error when Grant, a non-certified interpreter, translated Paz's statements, and those statements were introduced as evidence at trial. In September 2008, our Supreme Court adopted an Interpreter Code of Conduct to ensure that the communication barriers be removed for those who are partially or completely excluded from full participation in court proceedings due to limited English proficiency. Ind. Interpreter Conduct Rule I. This Code required that an interpreter be appointed in criminal cases when language issues could negatively impact the defendant's ability to effectively participate in his own defense. Interpreter Cond. R. IV. Our Supreme Court explained, "The Code sets forth the minimum standard of conduct the Indiana Supreme Court expects from any interpreter providing services for Indiana courts, but it is not intended

to be a vehicle for complaints about interpreting errors made by interpreters during the course of a proceeding, unless there is an allegation of gross incompetence or knowing misinterpretation or misrepresentation." Interpreter Cond. R. I.

[21] Paz argues that, because the statements he made at Teppanyaki were crucial to the State's case in chief, he was deprived of a fair trial when those statements were not translated by a certified translator. Paz recognizes that Grant spent ten years in Ecuador learning Spanish, had worked for the LPD for twenty-one years as a dispatcher and interpreter, and had some formal language training while in the military. *Appellant's Br.* at 23. Even so, Paz states that Grant's first language was English, she was not a certified interpreter in Indiana, and her employment with LPD created a conflict of interest. As such, Paz contends that Grant should not have been permitted to testify as an expert Spanish interpreter and that it was improper and prejudicial for the State to introduce State's Exhibit 32 and request publication of State's Exhibit 132—the recording of Paz's Teppanyaki interview and the transcript of that interview, respectively.

[22] In *Arrieta v. State*, 878 N.E.2d 1238, 1242 (Ind. 2008), our Supreme Court explained, "Interpreters serve two crucial roles in criminal proceedings. First, defense interpreters benefit the non-English-speaking defendant by simultaneously translating the English proceedings and assisting with attorney-client communications. Second, proceedings interpreters serve the court by translating the speech of participants at various junctures." Paz argues that Grant, as an interpreter, fell into the latter category. Here, we need not

determine what category, if any, Grant was part of because Paz has waived this issue for appeal.

[23] Paz concedes that he made no formal objection at trial to: (1) Grant's lack of certification and training; (2) Grant's testimony; or (3) the admission of State's Exhibit 32 and the publication of State's Exhibit 132. *Appellant's Br.* at 27. Failure to make a contemporaneous objection to the admission of evidence at trial generally results in waiver of the error on appeal. *Weedman v. State*, 21 N.E.3d 873, 881 (Ind. Ct. App. 2014), *trans. denied*. However, a claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines there was fundamental error. *Id*. To avoid waiver, Paz contends that the admission of Paz's interpreted statements constituted fundamental error. Fundamental error is a blatant violation of basic principles and is so prejudicial as to make a fair trial impossible. *Nur v. State*, 869 N.E.2d 472, 480 (Ind. Ct. App. 2007) (citing *Davis v. State*, 835 N.E.2d 1102, 1107 (Ind. Ct. App. 2005) (noting that defendant's failure to object at trial results in waiver, unless error is fundamental)). The State responds that Paz cannot show that he was denied due process or that a fair trial was impossible. We agree with the State.

[24] At trial, Paz was provided the services of interpreters Anna Maria Grandlienarda ("Grandlienarda"), Carmen Lucas ("Lucas"), Varinia Barreto ("Barreto"), and Noemi Lugo ("Lugo"). *Tr.* at 1-3, 328-29. Grandlienarda was an Indiana certified interpreter with a master's degree in Spanish. *Id*. at 1-2. Lucas and Barreto each had previously served as an interpreter in the

Tippecanoe County courtrooms, and they were "both seeking to be certified." *Id*. at 3. Lugo's native language was Spanish, and she had studied English in Mexico. *Id*. at 328. Lugo had interpreted for the trial court many times since 1994. *Id*. Defense counsel stated he was satisfied with the trial court's interpreters and had no objections. *Id*. at 4. Paz makes no allegation that there was defective translation at trial or that Grant improperly translated the Teppanyaki interview. Furthermore, through cross examination, defense counsel made clear to the jury the limitations of Grant's qualifications: (1) she only had language training in the military; (2) she was not a certified interpreter; (3) during the interview, Paz made statements "that were not stated correctly back to the police officer at that point"; (4) she was an employee of LPD; and (4) Spanish speakers have different colloquialisms, and Grant predominantly worked with people from Mexico and not Central America, where Paz was from. *Id*. at 186-88. This cross-examination of Grant allowed the jury to determine the appropriate weight to give to Paz's statements in the Teppanyaki interview.

[25]    More importantly, the statements Paz made during the Teppanyaki interview were only a small portion of the evidence the jury used to convict Paz. Paz and Pop each claimed that the other committed the murder. Pop stated that he and Paz had been drinking on the night of December 24, 2014 and that, later, they went to a party at the Brampton apartment. While at the party, Paz and Flores began fighting over the topic of gangs. The fight between Paz and Flores erupted again when Paz, Pop, and Flores returned to the Eagle Pines

apartment. Pop left the room to use the bathroom, and when he returned, he saw Paz with one hand around Flores's neck and the other hand holding a knife, which Paz used to repeatedly stab Flores in the chest. *Id.* at 388. Pop had previously seen that Paz kept a knife under his pillow. *Id.* at 392. The blood on the door of the Eagle Pines apartment contained a mixture of the DNA of Paz and Flores. *Id.* at 320-21. The blood found on the inside and outside of both of Paz's shoes contained a mixture of the DNA from both Paz and Flores. *Id.* at 321. The blood from the rear passenger area of Paz's Expedition was found to contain Flores's DNA. *Id.* Pop testified that he saw Paz roll Flores's body up in Pop's blanket and drag the blanket out the door. *Id.* at 399. Pop stayed at the apartment when Paz drove away to dispose of the body. When Paz returned, he gathered together all of his clothing and his television and placed them in the Expedition. *Id.* at 402. When Pop awoke the next morning, Paz was gone. *Id.* at 404.

[26] Paz testified that he was not associated with any gangs in El Salvador or the United States. *Id.* at 444. Paz had worked at Teppanyaki since 2012, and he lived in the living room of the Eagle Pines apartment, which he shared with Pop. Paz had known Pop for nine months, and Pop worked for Teppanyaki as the cutter of meats and vegetables. *Id.* Paz testified that Pop had a box of knives, the kind one would use at a table, plus "one more knife." *Id.* at 447. Paz stated that he knew Flores only by sight, but knew that Flores was the dishwasher for Teppanyaki. *Id.* at 447-48. In contrast to Pop's testimony, Paz maintained that Pop and Flores argued at the party and, suddenly, started

punching each other. *Id*. at 451. Paz said that they stayed at the party for about an hour more, and then Paz, Pop, and Flores went to the Emerald Pines apartment. Paz described that Pop and Flores got into a couple of fights, and at one point, Flores fell on top of Paz, causing Paz to hit his head. Paz testified that Pop stabbed Flores while Flores was still on top of Paz, and Paz was a bit dazed. Paz stated that Pop dragged Flores's body out of the apartment, wrapped in a blanket, and that Pop forced Paz, at gun point, to drive the Expedition to help Pop dispose of the body. Paz stated that he did not go to work the next day, but instead, went to Indianapolis to stay with his sister. Paz returned to Lafayette on December 26. Paz told police that Flores had informed Teppanyaki that "he was quitting work." *Id*. at 469. The State questioned how Paz could know this if, as he claimed, Paz did not know Flores. *Id*. at 468-69.

[27] The jury heard the direct examination and the extensive cross-examination of both of Paz and Pop. Paz and Pop each presented credible versions of events from which the jury could have entered a conviction for either man. The jury believed Pop and convicted Paz. The introduction of Paz's Teppanyaki statements, as translated by Grant, did not constitute fundamental error.

[28] Affirmed.

[29] Robb, J., and Barnes, J., concur.