**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 23 2013, 8:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

GEORGE A. REESE, JR.,              )
                                   )
    Appellant-Defendant,           )
                                   )
        vs.                        )        No. 31A05-1206-CR-309
                                   )
STATE OF INDIANA,                  )
                                   )
    Appellee-Plaintiff.            )

APPEAL FROM THE HARRISON SUPERIOR COURT
The Honorable Roger D. Davis, Judge
Cause No. 31D01-1003-FA-187

**May 23, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARTEAU, Senior Judge**

George Reese appeals his Class A felony child molesting conviction. We affirm.

## ISSUES

Reese presents three issues for our review, which we reorder and restate as:

I.  Whether testimony from the State's witnesses constituted improper vouching amounting to fundamental error.

II. Whether the trial court abused its discretion by admitting uncharged misconduct evidence.

III. Whether the prosecutor's references to rules limiting its witnesses' testimony constituted misconduct amounting to fundamental error.

## FACTS AND PROCEDURAL HISTORY

K.J., born in March 1996, lived with her family in New Albany, Floyd County. In May 2008, the family met Reese at a cookout. Reese moved in with them in New Albany, and when they moved in June 2008 to a four-bedroom one-bathroom house in Palmyra, Harrison County, Reese moved with them. The household in Palmyra consisted of five children and seven adults: K.J., her older brother R.J., her older sister L.J., her younger brother M.J., her younger sister S.J., her father Robert,[1] her stepmother Christina, her stepmother's cousin Tommy, Tommy's wife Angela, Tommy's brother Michael Priddy,[2] Michael Devore,[3] and Reese. While in Palmyra, Reese asked Robert

---

[1] Robert testified at Reese's trial that he had pleaded guilty to sexually molesting L.J. and K.J. in Floyd and Harrison Counties, that his Harrison County plea agreement required him to testify truthfully against Reese and Priddy, and that he was serving two consecutive forty-year sentences.

[2] Priddy testified at Reese's trial that he was serving seventy-five years for criminal activity with two of Robert's daughters. Although his testimony was not any more specific, we note that he was convicted of eight counts of Class B felony child molesting, with seven counts involving L.J. and one count involving K.J. *See Priddy v. State*, No. 31A01-1110-CR-455 (Ind. Ct. App. June 19, 2012), *trans. denied*.

and Christina if they knew "where he could get some young pussy." Tr. p. 1087. Robert and Christina said no.

Reese, who was fifty-two years old, flirted with twelve-year-old K.J., bought her ice cream and other items, and treated her differently from the other children. He also hugged her, which made her uncomfortable.

Robert was cooking out in the backyard one day when he sent K.J. into the kitchen for some ketchup. Upon walking into the kitchen, she saw Reese there. Reese asked K.J. to give him a blow job and pulled down his pants. Scared, K.J. knelt down and put her mouth on his penis. When S.J. appeared at the back door and saw them, K.J. stopped and went to her room, mad and humiliated that her little sister had to see her like that.

About a month after the family moved to Palmyra, S.J. told Christina what she had seen. When Robert learned about it, he confronted Reese, who admitted what he had done with K.J. Robert kicked Reese out of the house.

Robert invited Reese back to Palmyra sometime after the wind storm in September 2008 because he wanted to find out his last name. At some point, K.J. told L.J. about what Reese made her do. L.J. eventually stuck a knife to Reese's throat and ordered him out of the house. When Robert and Christina asked where Reese was, L.J. said she put a knife to his throat and kicked him out because he had been making K.J. do things to him. Robert called Reese and threatened him.

---

[3] Devore testified at Reese's trial that he served time in prison for child molesting and was released on probation, moved in with K.J.'s family in Palmyra for a couple of months, and was then picked up in Floyd County for sexual misconduct with a minor. Devore was convicted of that charge and had his probation revoked. At the time of Reese's trial, his projected release date was in 2024.

3

When Reese lived with the family, he gave them money for groceries and also bought them an above-ground pool. Several months after L.J. kicked him out at knifepoint, Reese called Robert and offered to buy the family some furniture. Robert said they did not need anything from him. Reese then asked to talk with K.J. Robert allowed it but monitored the call from another phone in the house. Reese asked K.J. "how his dick tasted in her mouth." *Id.* at 1085. Robert angrily interjected that he would rip Reese's heart out and feed it to him. Reese hung up.

Indiana State Police Detective William Wibbels began investigating the case in November 2009. During his investigation, he spoke with K.J., who had since been removed from the home and was staying at a youth shelter. K.J. told Detective Wibbels that Reese made her perform oral sex on him about two hundred times.

The State filed numerous charges against Reese but dismissed all but one count of Class A felony child molesting and one count of being a habitual offender. Before trial, Reese filed a motion in limine seeking to prohibit the State from presenting evidence of his alleged uncharged misconduct, which the court granted. Reese was tried in February 2012, but the jury deadlocked and the court declared a mistrial. Before the second trial, Reese took a polygraph examination, which he had been demanding to take since he was first charged. The examiner asked Reese in three different ways whether he had engaged in oral sex with K.J. Each time, Reese responded no and the examiner determined he was being untruthful.

4

K.J. and others testified for the State on retrial.[4] K.J. testified that Reese asked her for a blow job and pulled down his pants, and she complied. On cross, Reese verified with K.J. that she had initially told Detective Wibbels that she was forced to perform oral sex on Reese about two hundred times but was now telling the jury that it happened only once. The following exchange then occurred:

Q: Why would you lie to Officer Wibbels and tell him it happened two hundred times and then today say it only happened once?
A: We were talking about several different me [sic] so . . .
Q: Okay. So if you're talking about several different people that means it's okay to lie about what George did to you?
A: It wasn't practically lying.
Q: Pardon me?
A: It wasn't lying. It was mis-confusion.

*Id.* at 833. Reese then pointed out several inconsistencies between K.J.'s deposition testimony and trial testimony. On redirect, K.J. acknowledged the inconsistencies but testified that she had never wavered about the fact that Reese put his penis in her mouth when she was twelve years old. She further said that she had been abused by a lot of men and that it was difficult to keep everything straight. On recross, K.J. testified that five men, including Reese, had sexually abused her. On redirect, the State asked K.J. whether there were certain things she could not discuss at trial, and K.J. responded affirmatively. She said that those rules made it more difficult to answer questions.

Reese and others testified for the defense. Reese denied that any oral sex with K.J. occurred. He stated that the last time he stayed with K.J.'s family was for a few days in October 2008. One morning during that time, he thought he heard Robert asking K.J.'s

---

[4] K.J.'s younger sister S.J. testified, but the trial court determined that S.J. was testifying about a different incident and thus struck her testimony and admonished the jury not to consider it.

5

sister L.J. in the kitchen, "[D]o you want me to lick your pussy[?]" *Id.* at 1649. Reese

testified that he confronted Robert about it by phone in February or March 2009, and

Robert hung up on him. Reese claimed that no one thought he had done anything wrong

until he accused Robert of wrongdoing.

The jury found Reese guilty of Class A felony child molesting and subsequently

found him guilty of being a habitual offender. The trial court sentenced him to seventy

years: forty years for the Class A felony enhanced by thirty years for the habitual

offender finding. Reese now appeals.

## DISCUSSION AND DECISION

### I. VOUCHING TESTIMONY

The State's first three witnesses were Jeri Newton, Kristina Killen, and Detective

Wibbels. Newton was a child advocacy center forensic interviewer who had conducted

an interview of K.J. She estimated at trial that children lied about being molested in

about five percent of her cases and stated that those cases often involved child custody

disputes or pregnant teenagers. Newton further testified that it was common for a sex

abuse victim to give different versions of an event:

> Q:    So if I sat here today and said [K.J.] has said three or four or five
>       different versions of what happened, as your experience as a forensic
>       interviewer, as your experience as a Louisville Metro Officer, is that
>       shocking to you?
> A:    No.
> Q:    No. Is that common in your experience of a sex abuse victim?
> A:    Yes, I would say.

*Id.* at 710-11.

6

Department of Child Services investigator Killen testified that she met with K.J. several times and observed her interview with Newton through video surveillance in another room. Like Newton, she stated that it was rare for children to lie about being molested and that those cases often involved custody disputes or pregnant teenagers.

When Detective Wibbels was asked how often children related every detail upon initial questioning, he responded that it was "slim to none." *Id.* at 743. He testified he had investigated only a handful of cases where children lied about being molested. He added that most if not all of those cases involved custody battles and that the current case did not involve a custody battle. Detective Wibbels stated that in this case, he saw none of the factors he normally sees when a child fabricates an allegation:

> Q: . . . You said it's rare that children should make something up but it's usually, when it does happen, there's kind of a common denominator, it's a custody issue, something like that?
> A: Usually what I find is it's either a divorce or a custody issue or somebody is trying to get the kids.
> Q: Okay.
> A: And they would say, hey, you know maybe you say X touched you or something I'll get the kids. I'll get . . . You get to stay with me. That happens. It doesn't happen a lot but it happens.
> Q: Okay. Now during your investigation were any of these factors that you normally see, were any of these factors present with [K.J.'s] family?
> A: Absolutely zero.

*Id.* at 749-50.

Upon questioning by the defense during the defense's case, Detective Wibbels said that Reese contributed to the abuse of the children. The following exchange then occurred:

Q:     And you believe he's a part of it because what [K.J.] has told you?
A:     There . . . You know you asked me before about, oh, do kids make this up, kids make this up?  Yeah.  Kids make stuff up.  Divorce, custody, they don't like mom's new boyfriend.  This guy, they ain't never gonna see him the rest of his life, they didn't know about him.  They thought he might have been dead.  What are they making it up for?  What have they got to gain?  Nothing.  There's nothing in it for them.

*Id.* at 1578.

Reese now contends that Newton, Killen, and Detective Wibbels gave vouching testimony in violation of Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Vouching testimony is considered to be an invasion of the province of the jurors in determining the weight to be given to a witness's testimony.  *Palilonis v. State*, 970 N.E.2d 713, 729 (Ind. Ct. App. 2012), *trans. denied*.  The Indiana Supreme Court has recently declined to carve out an exception to Rule 704(b) for child victims of alleged sexual abuse.  *See Hoglund v. State*, 962 N.E.2d 1230, 1236-37 (Ind. 2012).

Reese argues that Newton gave improper vouching testimony when she said that she would not be shocked if she was told that K.J. had given several different accounts of the incident with Reese and, upon further State questioning, that such a response was common in her experience working with sexual abuse victims.  He also claims that Killen gave improper vouching testimony when she said that it was rare for children to fabricate molestation accusations and that those cases often involved custody disputes or pregnant teenagers.  Similarly, Reese challenges Detective Wibbels's testimony that children

8

rarely fabricate molestation accusations and that those cases usually involved custody battles. In addition, he claims Detective Wibbels improperly vouched when, upon being asked if K.J.'s family had any of the factors he normally sees when children lie about molestations, he answered, "Absolutely zero." Tr. p. 750. Reese also challenges Detective Wibbels's statement that the children had nothing to gain by lying, which was in direct response to the defense's question of whether Detective Wibbels believed Reese contributed to the abuse of the children because of what K.J. had told him.

Reese failed to object to any of this testimony at trial. He thus claims the admission of this evidence constitutes fundamental error. *See Konopasek v. State*, 946 N.E.2d 23, 27 (Ind. 2011) ("Failure to object to the admission of evidence at trial normally results in waiver and precludes appellate review unless its admission constitutes fundamental error."). The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Id.* This exception is available only in egregious circumstances. *Id.*

Reese claims this case is like *Gutierrez v. State*, 961 N.E.2d 1030 (Ind. Ct. App. 2012), and *Lainhart v. State*, 916 N.E.2d 924 (Ind. Ct. App. 2009), both of which involved vouching testimony resulting in fundamental error. In *Gutierrez*, a sexual assault nurse examiner testified that she believed the child victim was telling the truth, a

9

case manager from the Department of Child Services testified that she believed the child victim was telling the truth, and the prosecutor in closing stated that several people believed the child victim. The prosecutor also remarked that he believed the defendant lied. This Court concluded that the testimony along with the prosecutor's closing remarks constituted improper vouching requiring a new trial. 961 N.E.2d at 1035.

In *Lainhart*, the prosecutor said during jury selection that "it would take an awful lot to get an officer [to lie]" and that "there's no place for it in our society," and later said in closing that "if any officer would even come close to not putting out exactly what happened telling the truth, they're out. I would never, ever, put them in front of a Jury, if I suspected anything." 916 N.E.2d at 938. This Court concluded that the prosecutor's remarks constituted improper indoctrination, vouching, and commentary on the justness of the cause and found that the remarks, in combination with other instances of prosecutorial misconduct, constituted fundamental error. *Id.* at 938-39.

The testimony Reese directs us to here is of a vastly different character. None of the statements implied a belief that K.J. was truthful or credible. The State elicited general, non-specific statements about the frequency of fabrications and common reasons for them. And where it elicited more specific statements, none of the responses gave opinions on K.J.'s truthfulness or credibility. Newton merely stated that she would not be surprised if she was told that K.J. had given several accounts of the same incident, and Detective Wibbels merely stated, after having just testified that in his experience fabrications usually involved divorce and custody issues, that he did not see in K.J.'s

10

family any of the factors he normally sees when a child fabricates accusations. *Gutierrez* and *Lainhart* are thus distinguishable.

Detective Wibbels's testimony that the children had nothing to gain by lying presents a closer question, but we nonetheless conclude that it does not constitute improper vouching. Initially, we note that Reese invited any error as the testimony was in direct response to his question of whether Detective Wibbels's believed Reese contributed to the abuse of the children because of what K.J. told him. *See Baugh v. State*, 933 N.E.2d 1277, 1280 (Ind. 2010) ("Under the invited error doctrine, a party may not take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct." (internal quotation omitted)). In any event, Detective Wibbels did not testify that K.J. was telling the truth and instead said the children had nothing to gain by lying.

Reese has failed to show error, let alone fundamental error.

## II. UNCHARGED MISCONDUCT EVIDENCE

During cross-examination, Reese asked K.J.'s sister L.J. whether she liked him:

Q:     Would you tell us when you first met George Reese did you like
       him?
A:     No.
Q:     Have you ever liked him?
A:     No.
Q:     And you don't like him today, right?
A:     No.
Q:     Okay. So if I were to ask you to tell me something good about him
       you'd have a hard time doing that?
A:     Yes.
Q:     Okay. And that's been pretty much your consistent view of him the
       whole time you've known him?
A:     Yes.

11

Tr. p. 967. Reese also verified with L.J. multiple times that her trial testimony was that she had never seen him do anything to K.J. *Id.* at 980-83. He then pointed out her deposition testimony that she had caught him with K.J. a couple of times.

Before redirect, the State argued outside the presence of the jury that Reese's use of deposition testimony for impeachment purposes was giving the jury a skewed picture of the credibility of the State's witnesses and that his question to L.J. of whether she had seen him do anything to K.J. opened the door to evidence that L.J. saw him do things to K.J. in Floyd County:

> [O]ur witnesses have been lectured so many times about how they can only talk about one blow job in Palmyra to where now all their testimony . . . it makes it seem like the only thing George ever did was one blow job in Palmyra. And this jury is getting a very skewed picture of our witnesses and their reliability, their credibility because they have to answer the question only dealing with this one issue. And then when we get depositions out and we start picking and choosing it looks like they're just sitting up there and they can't remember anything. They can remember. They're just not allowed to talk about it.
>
> So the credibility of our witnesses is being handcuffed because they're not allowed to really give the answers that they want to so they just say no or I don't remember, I don't remember. Well why don't you remember? I just don't remember. When in reality i[t']s because they're scared to talk freely because we've lectured them so many times about how we can't get into anything other than the one blow job in Palmyra. And the perfect example was [L.J.] basically lied when she said have you ever seen anything bad happen to [K.J.]. She has. But she knows she's only allowed to talk about the one incident.
>
> So now it seems like all th[ese] other wild stories that . . . that [L.J.] is telling are . . . are lies and why can't you remember anything. Why are you telling inconsistent stories? It's because she's handcuffed and can only talk about this and it's very difficult for a teenager to sit here and . . . and be cross examined when the[y're] scared of what they can even say. So their answer is always no or I don't remember. I don't remember.

*Id.* at 1011-12. Reese argued that it was clear from the context of his question that he was asking L.J. about Palmyra and thus Harrison County only. He also noted that when L.J., in her deposition, discussed oral sex involving K.J., she was always talking about Harrison County. The trial court ruled that Reese's question was broader than he might have intended and that he thus opened the door to other evidence:

> [T]he State is allowed to, uh, come back and follow up with now that's actually not true. You did see him do something to your sister in another place in Floyd County. Yes. And, uh, the reason you responded the way you did is because you'd been told not to talk about that. Yes. That's right.

*Id.* at 1014. The court told the State not to elicit testimony of Reese's specific actions but told Reese he could ask whether the Floyd County incident involved oral sex.

Still outside the jury's presence, the State argued that L.J.'s testimony on cross that she never liked Reese made her sound vindictive to the jury and that she should thus be permitted to explain that she never liked Reese because he made her strip down, took pictures of her, and touched her chest. The court ruled that the State could elicit testimony that L.J. did not like Reese because he did inappropriate things to her and K.J. soon after they met but prohibited any specific details.

The jury returned to the courtroom, and L.J. testified on redirect that she never liked Reese because he made her and her sister do things they did not want to do in Floyd County about two days after they met. She further testified that she was not truthful when she answered no to Reese's question of whether she had seen him do things to K.J. because she was trying to answer within the rules she was given. She testified that she had in fact seen Reese do something to K.J. but that it occurred in Floyd County.

13

Reese now contends that the trial court abused its discretion by admitting this uncharged misconduct evidence in violation of Indiana Evidence Rule 404(b), which states in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." For evidence of other crimes, wrongs, or acts to be admissible, a court must: (1) determine that the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind. 2001). Further, otherwise inadmissible evidence may be admitted where the defendant opens the door to questioning on that evidence. *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009). The door may be opened when the trier of fact has been left with a false or misleading impression of the facts. *Id.*

As he claimed before the trial court, Reese argues he did not open the door to evidence of his uncharged misconduct in Floyd County by asking L.J. whether she had ever seen him do anything to K.J. because it was clear from the context of his question that he was only asking about the charged abuse in Harrison County. Reese may have intended his question to be limited to whether L.J. had ever seen him engage K.J. in oral sex in Harrison County; however, what he asked was the more general question of whether L.J. had ever seen him do anything to K.J. When L.J. answered that she had not, Reese pointed out that her deposition testimony stated otherwise. This made it appear that L.J. was a liar even though she was prohibited by the order in limine from saying she had seen Reese do things to K.J. in Floyd County. Regardless of how Reese may have

14

limited his questioning or provided "context" through other questions, the jury was left with the affirmative yet false impression that L.J. had never seen Reese do anything to K.J. The State was thus entitled to elicit generalized testimony that she had in fact seen Reese do something to K.J. but that it occurred in Floyd County.

Reese also argues he did not open the door to evidence of his uncharged misconduct in Floyd County by asking L.J. about her dislike of him. We disagree. Reese did not merely ask whether L.J. liked him; instead, he asked whether she liked him when they first met, whether she ever liked him, whether she liked him that day she testified, whether she would have a hard time saying anything good about him, and whether her opinion had been consistent the entire time she had known him. The testimony Reese elicited gave the jury the misleading impression that L.J. was vindictive and predisposed against him when in fact she had valid reasons for her dislike of him. Reese nonetheless argues that since L.J. said he made her strip down, took pictures of her, and touched her chest on the second night she knew him, that uncharged misconduct could not be the reason she did not like him when they first met. Considering it was less than two days between when they met and when L.J. said Reese violated her, it was well within the court's discretion to consider the uncharged misconduct to have occurred when they first met. Because Reese opened the door by emphasizing L.J.'s dislike of him, the State was entitled to elicit generalized testimony that she never liked Reese because he made her and her sister do things they did not want to do in Floyd County soon after they met.

We therefore conclude that the trial court did not abuse its discretion by determining that Reese opened the door to evidence of his uncharged misconduct.

15

## III. PROSECUTORIAL MISCONDUCT

Reese finally contends that the State committed prosecutorial misconduct. Specifically, he argues that the State improperly and repeatedly referred to rules that limited its witnesses' testimony.

In reviewing a properly preserved claim of prosecutorial misconduct, we determine whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been otherwise subjected. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). The gravity of the peril is determined by considering the probable persuasive effect of the misconduct on the jury's decision rather than the degree of the impropriety of the conduct. *Delarosa*, 938 N.E.2d at 696. To preserve a prosecutorial misconduct claim, the defendant must ask the trial court, at the time the misconduct occurs, to admonish the jury or move for a mistrial if admonishment is inadequate. *Castillo*, 974 N.E.2d at 468. Failure to request an admonishment or a mistrial waives the claim unless the defendant can demonstrate that the misconduct rises to the level of fundamental error. *Id.* Reese did not request an admonishment or a mistrial after any of the alleged instances of prosecutorial misconduct. He therefore operates under the heavy burden of showing fundamental error.

Reese points to the following statements during the State's case and in closing to support his prosecutorial misconduct claim:

16

As a preface to L.J.'s testimony about Reese's uncharged misconduct, the State

asked L.J. about how she had been told not to discuss certain matters and whether these

rules prevented her from testifying truthfully:

Q: Now is it safe to say that every time you came in here to testify you met with the prosecutors beforehand?
A: Yes.
Q: And have we went over certain rules about what you are allowed to talk about and what you are not allowed to talk about?
A: Correct.
Q: We do that every time?
A: Right.
Q: Every time you get on that stand are you scared that you're going to blurt out something that you're not suppose[d] to?
A: Yes.
Q: And have I told you what happens if you blurt out something that you're not suppose[d] to?
A: Yes.
. . . .
Q: And have . . . have these rules hampered you from telling your whole story?
A: Yes.
Q: Have they hampered you from explaining to this jury the entire truth about everything?
A: Yes.
Q: Okay. Now, without getting into any specifics, there have been several times throughout your testimony your answer has been yes, no, I don't remember, I don't remember. Have there been questions that you've not be[en] able to quite give an accurate answer to?
A: Yes.
Q: Have there been questions that your answer was flat out wrong?
A: Yes.
Q: And maybe you answered yes to a no and a no to a yes. Have you done that sitting here in that chair?
A: Yes.
Q: Okay. Were you lying when you did that?
A: Yes.
Q: Okay. Well . . .
A: Well . . .
Q: I wouldn't prefer to call it lying. Were you following our rules when you did that?

17

A:     Correct.
Q:     And if these rules wouldn't be in place would your answer have been different?
A:     Yes.
Q:     Okay. I think now we're gonna start to get to some truth. It should be easier for you to answer my questions.

Tr. pp. 1026-28. L.J. then testified about Reese's uncharged misconduct as noted above. She also testified that the State had never told her to lie on the stand and that she was supposed to raise her hand if answering a question required her to break the rules. The State commented, "I think your sister might have even done that yesterday." *Id.* at 1051.

In closing, the State argued:

> Do you remember what happened to [L.J.] once we got to remove some of the rules and some of her restrictions? Did she have an easier time testifying and trying to tell you all her story? Wonder how [K.J.] would have done if we'd had [sic] done the same for her.
> The Courtroom and our system of justice is all about rules. You have to follow the rules. Some are easy to follow, some are not. How many times did you see me and [co-counsel] right up there? It wasn't because the Judge was congratulating us on excellent questions we had just asked. No, we had just broken a rule. If me and [co-counsel] and [defense counsel] have such a hard time following these rules, and we do this stuff every day, imagine how hard it is for [L.J.] and [K.J.] to follow the rules and still testify.

*Id.* at 1796-97. Finally, after Reese finished his closing argument by urging the jurors to rely on the instructions and the evidence as opposed to their gut feelings, the State started its rebuttal closing by saying, "There we go with those rules again. Don't trust your gut, follow the rules, [be]cause the rules always work and they always get us the truth." *Id.* at 1827.

"It is clearly misconduct for a prosecutor to imply that he possesses evidence not known to the jury indicating that the defendant is guilty of the crime charged." *Johnson*

18

*v. State*, 453 N.E.2d 365, 369 (Ind. Ct. App. 1983). In *Johnson*, the prosecutor stated in closing that the job of a defense attorney is to "get his client off," "bring out all of the insignificant facts," "[b]ring out all of the legal technicalities and exercise the rights of that Constitution for his client." *Id.* at 368. The prosecutor then asked the jury to remember all the evidence he attempted to introduce when defense objections were sustained. This Court determined that these remarks implied the prosecutor had additional inculpatory evidence that the defense kept from the jury on technical grounds in order to get the defendant acquitted. We concluded that these comments, together with other remarks calculated to inflame the passions and prejudices of the jury, constituted prosecutorial misconduct and that the trial court thus erred by denying the defendant's mistrial motion. *Id.* at 369.

Here, in ruling that Reese opened the door to uncharged misconduct evidence, the trial court permitted L.J. to testify that "the reason you responded the way you did is because you'd been told not to talk about that." Tr. p. 1014. The State may have pointed out that the "rules" made it difficult for L.J. to testify in order to rehabilitate any credibility lost when Reese cross-examined her on the inconsistencies in her deposition and trial testimony. However, it was nonetheless improper for the State to elicit testimony and comment in closing that the "rules" prevented L.J. from testifying truthfully, to further note that K.J. was bound by the same rules, and to say that the State itself had broken several rules. This case does not rise to the level of the misconduct in *Johnson*, where the State insinuated that the defense was keeping evidence from the jury. Still, the jury here might have reasonably inferred that the State implied it had additional

19

evidence of guilt not revealed to the jury, and thus its statements constituted misconduct. Moreover, this misconduct had a probable persuasive effect on the jury's decision and thus placed Reese in grave peril. We therefore conclude that the State committed prosecutorial misconduct.[5]

Unlike the defendant in *Johnson*, though, who had objected to the prosecutor's remarks and moved for a mistrial, Reese must show fundamental error. As noted earlier, the fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa*, 938 N.E.2d at 694. In addition, harm is not shown by the fact that the defendant was ultimately convicted; rather, harm is determined by whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Baker v. State*, 948 N.E.2d 1169, 1179 (Ind. 2011). "Our task is to look at all that happened, including the erroneous action, and decide whether the error had substantial influence upon the verdict to determine whether the trial was unfair." *Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994).

---

[5] Reese also argues that the State committed misconduct by referring to the "rules" during the testimony of Michael Devore, who testified that he lived with K.J.'s family in Palmyra and that K.J. told him Reese was sexually abusing her. During direct, the State told Devore it was setting aside "some ground rules, what you can and can't talk about," before eliciting testimony that Devore had previously been convicted of child molesting and was incarcerated at the time of trial for a Floyd County conviction for sexual misconduct with a minor, for which he took a plea offer. Tr. p. 1197. There is no misconduct as the State did not imply it had evidence of Reese's guilt not known to the jury.

Reese points to Newton's testimony that the prevalence of the abuse reported in the home was "one of the worst" she had encountered in her career. Tr. p. 719. He also points to Detective Wibbels's testimony in the same vein: "[M]ost sex abuses I work, if this is [E]arth, most of my sex abuses are the moon or Venus, somewhere around in there. This thing is out in Pluto, Nova 9, or whatever you want to call it, it's out there. It's . . . I've never seen anything like it before and I pray to God I never see anything like it after." *Id.* at 1577. Reese argues that since he was only on trial for a single, brief act of oral sex, the testimony from Newton and Detective Wibbels left the jury to imagine what other horrific abuse Reese had inflicted upon the children that the "rules" prevented the State from revealing.

We cannot agree. Newton and Detective Wibbels were clear that multiple people had abused the children. *See id.* at 719-20 (when asked how many people were reported to have abused the children, Newton responded: "[T]hey named several family members and also included acts . . . acts between themselves as instructed by their family members, uh, outside family members."), 1577 (Detective Wibbels: "George Reese does not have complete culpability for their life but he has a piece of it."). Furthermore, it was evident from the witnesses throughout trial, including Robert, who testified he sexually abused his daughters K.J. and L.J., that the nature and extent of the abuse was amplified by other people who had abused the children.

Reese also highlights inconsistencies in the testimony of the State's witnesses, challenges the credibility of two inmates who testified he admitted engaging K.J. in oral sex, and points out that he testified at trial that he never made any admissions and never

21

engaged in oral sex with K.J. However, all of this evidence was squarely before the jury. Reese put the State's witnesses through rigorous cross-examination, challenged their credibility, pointed out inconsistencies in their testimony, testified at length in his own defense, and called several witnesses of his own.

Moreover, in this case Reese opened the door to rehabilitative testimony on redirect. It was thus proper for the trial court to allow the State to give the jury some explanation of why L.J. was changing her testimony. Although the State's comments went beyond what was appropriate, we cannot say they amount to fundamental error.

The investigation into K.J.'s home revealed that the children were subjected to extensive sexual abuse by several men. As noted at trial, the prevalence of the abuse made it difficult for K.J. to remember the details of the one isolated incident for which Reese was charged. Reese had the right to cross-examine K.J. and indeed exercised that right by pointing out several inconsistencies in her deposition and trial testimony. For her part, K.J. maintained she was clear at trial about what had occurred and never wavered about the fact that Reese put his penis in her mouth when she was twelve years old. Although we determine the State committed prosecutorial misconduct, we ultimately conclude that Reese nonetheless received a fair trial.

### CONCLUSION

We therefore affirm the trial court's judgment.

FRIEDLANDER, J., and PYLE, J., concur.