## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 17 2017, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kathleen Cleary
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony Delarosa,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | July 17, 2017<br><br>Court of Appeals Case No.<br>29A02-1612-PC-2852<br><br>Appeal from the Hamilton<br>Superior Court<br><br>The Honorable Steven R. Nation,<br>Judge<br><br>Trial Court Cause No.<br>29D01-1110-PC-15029 |

**Najam, Judge.**

# Statement of the Case

Anthony Delarosa appeals from the post-conviction court's denial of his petition for post-conviction relief. Delarosa raises the following two issues for our review:

1. Whether he received ineffective assistance from his trial counsel.

2. Whether he received ineffective assistance from his appellate counsel.

We affirm.

# Facts and Procedural History

The facts underlying Delarosa's convictions were stated by the Indiana Supreme Court in Delarosa's direct appeal:

> The bodies of Rebecca Payne and her boyfriend, George Benner, were discovered in her bedroom at her house in Home Place, Indiana, around noon of April 5, 2007. Police investigation quickly focused on Toby Payne, Rebecca's estranged husband against whom she had obtained a protective order a month earlier. Rebecca, who was in the final stages of divorcing Payne, had been living apart from him with their six-year-old son.
>
> Phone records led the police to arrest Juan Lucio, Kyle Duckworth, and Anthony Delarosa within two weeks of the murders. Lucio and Duckworth lived in Frankfort, and Delarosa lived in Zionsville. A search of Delarosa's bedroom uncovered dark-colored clothing, dark gloves, a letter purportedly from Payne, a rag that smelled of a solvent often used to clean guns,

and two keys. A search of Lucio's person and vehicle uncovered two keys. All four keys locked and unlocked Rebecca's front door. Delarosa was charged with two counts of murder and one count of conspiracy to commit murder, all Class A felonies. The State requested life sentences without parole for the two murder charges.

Duckworth testified at Delarosa's trial pursuant to a plea agreement. Tara Cassada, Lucio's girlfriend, and Erica Tamayo, Duckworth's girlfriend, also testified. Lucio, Duckworth, Cassada, and Tamayo socialized together frequently, and the two boyfriends often confided in their girlfriends. Cassada was granted "use immunity" to testify.

Cassada testified that sometime[] in the fall of 2006, Payne began making plans with Lucio to kill Rebecca to get full custody of their son, and he gave Lucio a key and a map to Rebecca's house. Lucio originally planned to do the shooting himself, but hired Delarosa because "he would go in and be out quick." Lucio and Delarosa would then split Rebecca's $100,000 life insurance policy.

Duckworth testified that in late March or early April of 2007, Lucio asked him to help with the shooting. They were not to harm Payne's son, but would kill George if he was there. Duckworth would be the driver, and he would receive $200 or a quarter pound of weed for his involvement.

On the evening of April 2, 2007, Duckworth picked up Lucio and Delarosa, and the trio drove to a parking lot behind Rebecca's house. Lucio gave a gun to Delarosa and instructed him where to go. Delarosa left the car, returned about 20 minutes later, said nobody was home, and gave the gun back to Lucio.

Two days later, on April 4, the trio tried again. Duckworth picked up Lucio from his home in Frankfort and Delarosa from his home in Zionsville. Duckworth drove to the same parking lot, and Lucio again gave the gun to Delarosa, who left the car around 9:00 PM. Duckworth moved his car to a different spot, prompting a cell phone call from Delarosa about 20 minutes later asking where they were. When Delarosa returned to the car, he said, "they're done," and recounted how he walked in on George performing oral sex on Rebecca in her bedroom. Delarosa said he emptied his clip, shot them both, and left her body on the bed and his body on the floor. Cassada and Tamayo both testified as to what their respective boyfriends said Delarosa said that evening. On the way home, at 9:41 PM, Duckworth was pulled over because his license plate light was out. The officer knew and recognized Delarosa, who was sitting in the back seat of the car, and testified that Delarosa was wearing dark-colored clothing.

Forensics experts confirmed that Rebecca died from a gunshot wound to the head and that George died from a gunshot wound to the chest. They opined that the smearing and pooling of blood on the bed and on the floor, as well as the characteristics of the entry and exit wounds, were consistent with George performing oral sex on Rebecca when they were shot.

Phone records confirmed a large amount of communication between Payne, Lucio, Duckworth, and Delarosa leading up to and following the murder, and allowed the officers to track the movements of the cell phones. The three days before the protective order was served on Payne, February 26-28, 2007, Lucio placed one call to Payne and two calls to Delarosa. On March 1, Lucio placed four phone calls to Payne and one to Delarosa. The following day, Lucio placed three calls to Payne and six to Delarosa. Records from April 2, the day of the first attempt, showed eleven calls between the four. On April 4, Lucio's cell phone "hit on"—i.e., utilized—a tower in Frankfort

from 11:39 AM to 8:12 PM. From 8:27 PM to 8:29 PM, Lucio's cell phone hit on a tower in Thorntown. At 9:27 PM, both Lucio and Delarosa's cell phones hit on a tower in Home Place located about half-a-mile from Rebecca's home. This hit corresponded with a call Delarosa placed to Lucio at 9:27 PM. Lucio's cell phone then hit on towers in Brownsburg, from 9:50 PM to 9:53 PM, and in Frankfort, at 10:14 PM. Phone records for April 5, the day the bodies were discovered, showed twenty calls between the four. On April 11, during the officers' interviews of Cassada and her mother, Lucio and Delarosa exchanged six text messages and one phone call.

A cellmate who was with Payne and Delarosa at the Hamilton County Jail testified that when Delarosa arrived at the cell block, Payne was already there. Delarosa said to Payne, "You got me hit on my cell phone." A few days later, the cellmate overheard Delarosa asking Payne, "Where is the money?"

The jury found Delarosa guilty on all three counts. At the sentencing hearing, Delarosa waived his right to a jury. The trial court found that Delarosa qualified for sentences of life without parole (LWOP) for the murder counts, and imposed consecutive LWOP sentences. The trial court imposed a sentence of fifty years for the conspiracy count, and ordered that to be served consecutively to the LWOP sentences.

*Delarosa v. State*, 938 N.E.2d 690, 692-94 (Ind. 2010) (footnotes omitted) ("*Delarosa I*").

[4] In *Delarosa I*, Delarosa raised the following arguments for our Supreme Court's review:

1) Lucio's statement to Cassada and Duckworth's statement to Tamayo about the shooting after it occurred were hearsay

because these statements were not in furtherance of the conspiracy and admitting these statements constituted fundamental error; 2) during closing arguments, the prosecutor committed misconduct by inappropriately commenting on Delarosa's failure to testify at trial; and 3) the evidence was insufficient to convict Delarosa of the murder charges.

*Id.* at 694. Our Supreme Court rejected Delarosa's arguments and affirmed his convictions.

[5] Thereafter, Delarosa filed his petition for post-conviction relief, which he later amended. The post-conviction court held an evidentiary hearing on Delarosa's amended petition. The court then entered findings of fact and conclusions of law in which it denied the petition. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[6] Delarosa appeals the post-conviction court's denial of his petition for post-conviction relief. Our standard of review in such appeals is clear:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Campbell v. State*, 19 N.E.3d 271, 273-74 (Ind. 2014). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* at 274. In order to prevail on an appeal from the denial of post-conviction relief, a petitioner must show that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case entered findings of fact and

conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (internal quotation omitted).

*Humphrey v. State*, 73 N.E.3d 677, 681-82 (Ind. 2017).

[7] In this appeal, Delarosa contends that he received ineffective assistance of counsel.

> When evaluating an ineffective assistance of counsel claim, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009). To satisfy the first prong, "the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002) (citing *Strickland*, 466 U.S. at 687-88, 104 S. Ct. 2052). To satisfy the second prong, "the defendant must show prejudice: a reasonable probability (i.e. a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052).

*Id.* at 682. Delarosa asserts that he received ineffective assistance from both his trial counsel and his appellate counsel. We consider each issue in turn.

### Issue One: Trial Counsel

[8] We first consider Delarosa's claim that he received ineffective assistance from his trial counsel. In particular, Delarosa asserts that his trial counsel's assistance was ineffective for two reasons: (1) his counsel did not adequately prepare for the penalty phase of Delarosa's trial[1] and (2) his counsel failed to have a polygraph examination of Duckworth admitted into the record. We cannot agree that Delarosa received ineffective assistance from his trial counsel.

[9] Delarosa's first argument—that his trial counsel did not adequately prepare for the penalty phase—is not supported by the record. During the evidentiary hearing before the post-conviction court, Delarosa's trial counsel, John Tompkins, testified that he met with Delarosa's prior counsel, Steven Brock, on several occasions, and that Brock continued to assist Tompkins as a "mitigation specialist/expert." P-C Tr. at 31. Brock informed Tompkins that Brock had investigated several potential mitigating factors; namely, Brock had interviewed Delarosa and Delarosa's family members, and he had reviewed Delarosa's criminal history and other records. Tompkins, who has experience with major felony cases, testified that he was familiar with potential mitigating

---

[1] Delarosa also asserts that he did not knowingly, intelligently, and voluntarily waive his right to a jury during the penalty phase, but Delarosa's argument on this issue is premised on his argument that his trial counsel had failed to adequately prepare for that phase of the trial. As we hold that Delarosa has not shown that his counsel failed to adequately prepare for the penalty phase, we need not consider Delarosa's further argument with respect to his waiver of his jury right.

circumstances in such cases and that he "would meet with [Brock] regularly" to discuss any potential mitigating circumstances in Delarosa's case. *Id.*

[10] In light of his and Brock's investigations, Tompkins concluded that it was "clear" that there were no "substantial mitigator[s]" to present during the penalty phase. *Id.* at 37. Rather, Tompkins advised Delarosa that "his best option" was to make only "legal arguments." *Id.* Tompkins further testified before the post-conviction court that he felt prepared for the penalty phase and that, had he not felt prepared, he would have moved to continue, which he did not do.

[11] The post-conviction court relied on Tompkins' testimony and found that Tompkins effectively prepared for the penalty phase of Delarosa's trial. As the court found:

> 9.  Mr. Tompkins testified he was certified by the Indiana Public Defender Counsel for Death Penalty cases and had been involved with and tried several death penalty and Life Without Parole cases prior to his involvement in this case. Further, he testified he would have gone through his checklist of factors to look for regarding mitigating circumstances recommended by the Public Defender Council. He had personally gone to Boone County and reviewed [Delarosa's] voluminous juvenile history and reviewed all of the documents provided by previous counsel[,] which included the Boone County Presentence Investigation and its attachments[,] which had been secured by the previous investigator, Charles Keenan. Although Steve Brock, a mitigation expert, did not complete his report[, that] does not change that [Tompkins] was well apprised of [Delarosa's] social background, which includes the medical,

family[,] and educational history as well as [Delarosa's] substance abuse issues.

Appellant's App. Vol. 2 at 178-79. The post-conviction court's findings and conclusions are supported by the record, and Delarosa's argument to the contrary is merely a request for this court to reweigh the evidence, which we will not do. We also agree with the State that Delarosa failed to demonstrate to the post-conviction court any significant mitigating evidence that might have been presented during the penalty phase of his trial.

[12] We likewise reject Delarosa's second argument. On this issue, Delarosa asserts that Tompkins rendered ineffective assistance because he did not seek to have a polygraph examination entered into evidence either to impeach Duckworth or as a mitigating circumstance. But it is well-established that the results of polygraph examinations are not reliable and, as such, not admissible absent a stipulation by the parties. *Hubbard v. State*, 742 N.E.2d 919, 924 (Ind. 2001). We reject this purported basis for impugning Tompkins' assistance. As the post-conviction court found, "there is no Indiana case [that] supports" Delarosa's position on this issue. Appellant's App. Vol. 2 at 181. We affirm the post-conviction court's judgment that Delarosa did not receive ineffective assistance from his trial counsel.

### Issue Two: Appellate Counsel

[13] We thus turn to Delarosa's challenge of his appellate counsel's assistance. Here, Delarosa avers that his appellate counsel, Jack Crawford, rendered

ineffective assistance because he did not challenge the purported use of nonstatutory aggravating circumstances when the court imposed the sentence of life without parole. We cannot agree with Delarosa's reading of the record on this issue.

[14] In deciding whether to impose a sentence of life without parole, a trial court must limit its consideration of aggravating factors to only those enumerated in Indiana Code Section 35-50-2-9(b). *See Corcoran v. State*, 739 N.E.2d 649, 655 (Ind. 2000). A written sentencing statement "guard[s] against the influence of improper factors at the trial level . . . ." *Schiro v. State*, 451 N.E.2d 1047, 1053 (Ind. 1983). Further:

> It is usual practice for a trial judge to comment when the sentence is announced in open court. When a trial judge's oral comments refer to factors not included in the court's separate written findings, the issue may arise as to whether such remarks demonstrate impermissible use of a nonstatutory aggravating factor. *Bellmore v. State*, 602 N.E.2d 111, 129 (Ind. 1992).

*Corcoran*, 739 N.E.2d at 656. In such circumstances, "the issue whether such [oral] remarks demonstrate impermissible use of a nonstatutory aggravating factor depends upon a determination under state law as to whether the judge *relied* upon the nonstatutory factor." *Bellmore*, 602 N.E.2d at 128 n.6 (emphasis in original).

[15] Here, in its oral pronouncement of Delarosa's sentence, the court stated:

The Court having incorporated the evidence from Phase 1 of the trial and evidence presented in this phase and the arguments of the counsel, the Court does now find that the State has proved beyond a reasonable doubt the aggravating circumstances of on or about April 4, 2007, in Hamilton County, Anthony D. Delarosa committed the murder of Rebecca Payne after having been hired to kill Rebecca Payne in violation of I.C. 35-50-2-9(a) and subpart (b)(4) as shown in Count 1 of the aggravating circumstances. . . .

As to aggravating circumstance number 2, the Court finds that on or about April 4, 2007, in Hamilton County, Indiana, Anthony D. Delarosa[] committed another murder, to-wit: did kill George Benner in violation of I.C. 35-50-2-9(a) and subpart (b)(8). . . .

As to aggravating circumstances 3, the Court does not find that the State of Indiana has proved beyond a reasonable doubt that on or about April 4, 2007, in Hamilton County, Indiana, Anthony D. Delarosa was on parole at the time the murder was committed in violation of I.C. 35-50-2-9(a) and subpart (b)(9)(d). No mitigating circumstances have been presented with the exception that the State has mentioned that the age may be a mitigator. The Court, because of the cold, calculating murder of these two innocent victims though finds that such mitigator has not been shown by a preponderance of the evidence. The Court finds that the aggravating circumstances as found[,] as shown beyond a reasonable doubt[,] outweigh any mitigating circumstances. The Court makes such finding based on the fact that the defendant knowingly and willingly entered into a conspiracy to kill Rebecca Payne and George Benner. The defendant accepted a key to enter Rebecca Payne's residence and also accepted a gun on two occasions to carry out these murders. The defendant's sole purpose for being brought into this conspiracy was to commit the actual killings. The defendant on April 2, 2007[,] first attempted to commit the murder of Rebecca Payne but she was not home. The defendant entered her

residence and sat on her bed before leaving. Instead of abandoning this conspiracy, it was decided that he would try again. On April 4th the parties drove, again[,] . . . to the residence. Again, the defendant entered the residence after receiving the gun. But this time the victims were present. *He coldly executed the two victims by emptying his entire clip into their bodies and exiting the residence, leaving them to die. The defendant showed no remorse as to what he had done and even laughed and made crude comments about the condition of the victims. The defendant after killing these two innocent victims disposed of the handgun. Instead of having any remorse, the defendant's only concern was when he entered the car and when he entered the Hamilton County Jail was when would he get paid. The Court finds that because of the coldness and because of no remorse being shown and the ability to kill two human beings in this fashion that the Court does find that the defendant as to Count 1 . . . and also as to Count 2 . . . should be sentenced to life without parole.*

Tr. at 1071-74 (emphasis added). In its written sentencing order, the trial court confirmed its findings as to the three statutory aggravating factors, that there were no significant mitigating factors, and that the aggravators outweighed any mitigators. The court further reiterated the facts and circumstances of Delarosa's crimes as support for its findings.

[16] At the evidentiary hearing before the post-conviction court, Crawford testified that he was aware of the prohibition against the court's consideration of nonstatutory aggravating factors but did not believe that the court considered any such factors in its judgment. The post-conviction court agreed with Crawford's assessment, finding as follows: "*Bellmore* and its progeny are not controlling[] for the reason that the Court merely enunciated the facts

supporting its findings of the statutory aggravating factors." Appellant's App. Vol. 2 at 184-85. We agree with the post-conviction court.

[17] Delarosa does not actually identify any nonstatutory aggravators that he asserts were improperly relied on by the trial court. Rather, he simply quotes the italicized language from above and asserts that that language was an improper aggravator. But the court's oral and written statements make clear that the court was describing the nature and circumstances of Delarosa's crimes. And the Indiana Supreme Court has made clear that "the circumstances of the crime often provides an appropriate context for consideration of the alleged aggravating and mitigating circumstances," and that "[i]nclusion of the nature and circumstances of the offense in a trial court's sentencing order does not necessarily compel a conclusion that such matters were improperly considered and weighed as aggravating circumstances." *Prowell v. State*, 687 N.E.2d 563, 567 (Ind. 1997).

[18] That is the case here. The trial court thoroughly described the nature and the circumstances of Delarosa's crimes, but nothing in the court's oral or written statements demonstrates that the court improperly considered and weighed those facts as aggravating circumstances. To the contrary, the court's assessment of the nature and the circumstances provided appropriate context for the court's consideration of the argued aggravating and mitigating circumstances, which the court clearly delineated in its statements. Accordingly, Crawford did not render ineffective assistance when he did not

raise this purported issue on direct appeal, and we affirm the post-conviction court's judgment on this issue.

## Conclusion

In sum, we hold that Delarosa has not met his burden to show that the post-conviction court's judgment is contrary to law. We affirm the post-conviction court's denial of his petition for post-conviction relief.

Affirmed.

Riley, J., and Bradford, J., concur.