

FILED

Feb 20 2020, 7:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Keith B. Ivory, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 20, 2020

Court of Appeals Case No.
18A-CR-2575

Appeal from the St. Joseph
Superior Court

The Honorable John M.
Marnocha, Judge

Trial Court Cause No.
71D02-1701-MR-1

**Sharpnack, Senior Judge.**

# Statement of the Case

[1] Keith B. Ivory, Jr., appeals his conviction by jury of murder, a felony.[1] We affirm.

# Issues

[2] Ivory raises three issues, which we restate as:

  I.   Whether the State presented sufficient evidence to sustain Ivory's conviction.

  II.  Whether the trial court erred in admitting DNA evidence at trial.

  III. Whether the trial court erred while instructing the jury.

# Facts and Procedural History

[3] Ivory was also known as "Kane" or "Linden Street." Tr. Vol. II, pp. 57, 176. He had those names tattooed on his right shoulder and forearm, respectively.

[4] Ivory had a grudge against Bethel Smallwood, believing that Smallwood had been at least partially responsible for the death of his sister in 2012 or 2013. He later told a friend, Ronald Nichols, that he had been waiting for "the opportunity" to get revenge. *Id.* at 169.

---

[1] Ind. Code 35-42-1-1 (2014).

[5] On the morning of June 24, 2016, Ivory arrived at the house of Verdell Williams and his then-fiancée, VirSarah Davis. The house was across the street from the Kickback Lounge ("Kickback"), a bar. Kickback had installed security cameras that recorded events up and down the street, including at Williams and Davis' house. In addition, the house was around the corner from Po Boys, a barbeque restaurant. An alley ran behind the house, providing a more direct route to and from Po Boys.

[6] Williams knew Ivory as Linden Street and had seen him in the neighborhood before. When Ivory arrived, Williams and Davis were standing under a tree down the block from their front yard. He approached them and spoke with them for a short while before Williams and Ivory walked away together. They briefly went into Williams and Davis' house before getting into Williams' car. During this time, the men discussed an automobile sale.

[7] Next, they drove to a liquor store and, after purchasing some drinks, returned to park in front of the house for a short time before leaving to go to another store. As they drove to the second store, they passed Po Boys. Williams and Ivory returned to Williams and Davis' home a few minutes later.

[8] Next, Williams and Ivory entered the house, followed by Davis, who had been talking to someone else outside. Thirty minutes later, all three left the house. Williams and Davis walked down the sidewalk in the direction of Po Boys. Ivory followed, after stopping to talk with another person. Williams and Davis

returned to their house via the same route a few minutes later, around three p.m., without Ivory.

[9] Meanwhile, Bethel Smallwood and Felicia Nelson had arrived at Po Boys in a silver car. Smallwood remained in the car while Nelson purchased a plate of ribs. She brought the ribs to him and reentered the restaurant. Dorian Skipper, a Po Boys employee, walked past the car and briefly spoke with Smallwood as he ate.

[10] Jeremy Keltner lived near Po Boys. Shortly after 3:00 p.m. that day, he looked out of his window toward Po Boys and saw a man approach the driver's side door of a parked silver car. The man had a dark-colored shirt or jacket hanging from his shoulders. He also wore dark colored pants or shorts. Keltner watched the man raise his hand and fire three shots into the car. A nearby "ShotSpotter," which is a device that pinpoints the time of gunshots in the area, reported that the shots occurred at "3:07 and 52 seconds in the afternoon on June 24, 2016." Tr. Vol. III, p. 218.

[11] Skipper heard the gunshots and walked around the corner of the building. He saw Smallwood slumped over in the car, with blood running down his shirt. Skipper also saw a figure standing by the driver's side of the car, but he later could not remember any details about that person. Skipper went inside the restaurant and locked the door.

[12] Keltner watched the shooter run into an alley. Meanwhile, Briana Vela was in her kitchen when she heard gunshots, and when she looked out of her window toward Po Boys, she also saw a man running into an alley.

[13] Williams and Davis were outside, down the street from their front yard, when Davis heard gunshots. Ivory appeared in their front yard, having walked from between their house and a neighboring house. He walked up to them and briefly spoke with them before walking back the way he had come. Ivory reappeared in the front yard a short time later, went to Williams and Davis' front porch, discarded an item, and walked away.

[14] By that time, Vela had exited her house and was watching as people gathered on the street. She saw Ivory, and she noted that while many other people were standing outside, being "nosey" and trying to find out what happened, Ivory was walking away like he was "avoiding the scene." Tr. Vol. II, p. 209. A different neighbor's security camera recorded Ivory walking away from the area, shirtless.

[15] Meanwhile, Davis returned to her front porch with Williams and found a black t-shirt. She handed the shirt to Williams, who walked around the side of their house and placed the shirt in a bin in their backyard.

[16] Sergeant Charles Stokes of the South Bend Police Department was dispatched to Po Boys to investigate a reported shooting and found Smallwood slumped over in the car, deceased. Stokes and other officers secured the scene, contacted homicide detectives, and began questioning people in the neighborhood.

[17] Next, detectives and crime scene investigators arrived. They found shell casings on the ground near Smallwood's car. They also examined the alley through which the shooter had fled. The officers opened Williams' recycling bin and found the black t-shirt. Later that evening, the officers found a Taurus semiautomatic handgun in a gutter on the roof of Williams' house. Williams had never seen the gun before. Subsequent testing revealed that the shell casings the officers found near Smallwood's body had been fired from that handgun. The handgun had been purchased by Ivory's wife in 2015.

[18] A June 26, 2016 autopsy of Smallwood's body revealed he had been shot twice in the neck, with an additional graze wound on the back of his scalp. The two shots that hit him in the neck were fired from within a few feet.

[19] The police used buccal swabs to collect DNA samples from Williams, Davis, and Smallwood's body. Shawn Stur, who is a forensic DNA analyst with the Indiana State Police Laboratory ("the Lab"), subjected the t-shirt to DNA testing. She attempted to generate a DNA profile from swabs taken from the t-shirt, but half of the swabs did not provide enough genetic material for testing, and the genetic material on the other half of the swabs had multiple contributors. At that time, the Lab did not have a process to effectively interpret DNA samples with multiple contributors.

[20] Subsequently, the Lab adopted a new "probabilistic genotyping software" called "STRmix," which was developed in Australia and New Zealand. Tr. Vol. III, p. 69. STRmix analyzes samples using a process of "deconvolution."

*Id.* at 71. When a sample contains genetic material from multiple contributors, the program calculates possible genotype pairings in the material to identify the most likely genetic profiles. After that process is complete, an analyst compares the likely profiles to known profiles that have been collected from witnesses or suspects, and STRmix generates a "likelihood ratio" that the known profile, as opposed to the profile of an unknown person, contributed to the mix. *Id.* at 75. Stur explained that, contrary to prior DNA analysis methods, "[t]here are no match statements. It's all just basically likelihoods." *Id.* at 72.

[21] The Lab has developed a "verbal scale" to help explain what STRmix's likelihood ratio means in each case, as follows:

> Ours is from 1 to 10 is considered uninformative and that is because 99 percent of our false inclusions during validation between had a likelihood ratio between one and ten. So anywhere from one to ten is considered uninformative. Ten to one hundred is consider [sic] weak support whether it be for inclusion or exclusion. One hundred to a thousand is moderate support and over a thousand is strong support; and that's our four basically [sic] divisions.

*Id.* at 75-76.

[22] Thirty-five laboratories in the United States use STRmix for casework. The laboratories include the FBI's laboratory, the United States Army Criminal Investigation Laboratory, and the California Department of Justice.

[23] The Lab trained Stur and other analysts on the new software program and asked them to reexamine prior cases to see if STRmix might deliver results

where prior testing had failed. In Smallwood's case, Stur had four samples from the t-shirt, and each sample contained a mix of four contributors. She applied the STRmix program to the samples and compared the likely profiles generated by the program with known profiles from Smallwood, Williams, Davis, and Ivory, who by this time had submitted a DNA sample pursuant to a search warrant. Stur concluded:

> So those where [sic] the two propositions, either the profile originated from Keith Ivory and three unknown individuals, or that it originated [from] four unknown unrelated individuals. And on all four of those that were four person mixtures, it was at least a trillion times more likely if it originated from Keith Ivory and three unknown individuals than if it originated from four unknown individuals and that's in that strong support group.

*Id.* at 78. Smallwood, Davis, and Williams were all excluded as possible contributors to the DNA found on the t-shirt.

[24] Stur also received swabs that were taken from the Taurus handgun that had been used to kill Smallwood. She applied the STRmix process to a swab that had collected genetic material from the trigger and compared the likely profiles with Ivory's known profile, with the following results:

> [T]he swab of the trigger I interpreted it as originating from three individuals and the propositions were that the profile originated from Keith Ivory and two unknown individuals or that it originated from three unknown unrelated individuals. And that profile was 860 times more likely if it originated from Keith Ivory and two unknowns than if it originated from three unknowns. And this is in that moderate support range.

*Id.* at 79. She also analyzed genetic material found on the handgun's grip using STRmix, and when compared with Ivory's known sample, she discovered: "And that profile was 230 times more likely if it originated from Keith Ivory and one unknown than if it originated from two unknowns and this is also in that moderate support range." *Id.* at 80.

[25] Meanwhile, the police had obtained Ivory's mobile phone number from Williams. Using a search warrant, they obtained Ivory's call history and location records from his mobile phone service provider. The records showed that Ivory's phone received a call at 3:10 p.m., when it was in the area of Po Boys, and made a call at 3:25 p.m., while it was still in the area of Po Boys.

[26] During the summer of 2016, Ronald Nichols' stepbrother, Jermon Gavin, spoke with Ivory. Ivory told Gavin "he was involved in what happened in front of Po Boys." *Id.* at 137. Ivory further explained "[t]hat he had killed a guy. He shot him in the face, got it done clean, no face, no case, and that the guy had something to do with his sister dying." *Id.* Next, Ivory told Gavin he had discarded a shirt and the handgun after the shooting.

[27] On or about August 1, 2016, Ivory was staying with his friend Nichols. Ivory told Nichols he had killed Smallwood at Po Boys. Ivory further told Nichols that he had put his shirt over his head, approached Smallwood, and shot him multiple times before running away down an alley, disposing of the gun and his shirt along the way. Ivory explained "the murder weapon was in his wife's name," and he had instructed his wife to state, by way of an alibi, that the gun

had been "sold at a gun auction in Fort Wayne" before the murder. Tr. Vol. II, p. 167. Ivory further said he had been "waiting" to get Smallwood for his sister's death. *Id.* at 169. Finally, Ivory told Nichols that if the police ever questioned him about the shooting, he would "tell them he was [at] a Muslim mass or something." *Id.* at 179.

[28] During a January 3, 2017 police interview, Ivory initially denied being in South Bend on the day of the shooting, claiming he had been in Michigan attending religious gatherings for the month of Ramadan. After being told there was video of him at Williams and Davis' house on the day of the shooting, he agreed he could have been in the area on that day. When asked about the handgun, he told the officers he believed his wife had sold it at a gun show in Fort Wayne.

[29] On January 5, 2017, the State charged Ivory with murder. During a January 7, 2017 phone call from jail, Ivory told a person he was not going to "beat this." Tr. Ex. Vol., State's Ex. 300 at 1:40. He also told the person "guess you can't get away with everything." *Id.* at 2:53.

[30] In early 2017, Anthony Huey was incarcerated with Ivory in the St. Joseph County Jail. Ivory told Huey "about the guy Bethel who apparently had killed his sister a few years back and he retaliated for it." Tr. Vol. III, p. 199. Ivory further explained, "Bethel parked outside of Po Boys. That's when [Ivory] ran up and shot him" with a "40 caliber Taurus." *Id.* at 200. Ivory further said that he ran away from the scene and "threw the gun on top of a roof." *Id.* Ivory

also told Huey that when he learned the police had found the gun, he was worried "because the gun was registered to his wife's name." *Id.* at 201. Ivory explained that he told his wife to tell officers "that she sold the gun at a gun and knife convention." *Id.* Finally, Ivory mentioned to Huey that the police discovered he may have been involved in the shooting only after his mother reported him to the police after she had an altercation with Ivory's wife.

[31] Gavin and Ivory were also both incarcerated in the St. Joseph County Jail in 2017. On one occasion, Ivory approached Gavin and told him to tell Nichols "to keep his mouth closed" about Ivory having guns. *Id.* at 139. Ivory also said, "the guy had something to do with his sister dying so he got his lick back something [sic]." *Id.* On another occasion, Ivory was angry at a person who was in Gavin's cellblock, or pod. Ivory told Gavin, "[Y]ou need to tell him that I don't play no games. I'm GD Elite and that I can get in touch, and did you see what I did in front of Po Boy?" *Id.* at 141.

[32] During a March 23, 2017 call from jail, Ivory discussed with his wife the importance of encouraging witnesses to avoid subpoenas to testify. He explained that they would need to abandon their usual routines to avoid being found by the police and forced to appear to testify.

[33] In June to August of 2017, Daniel Mallett was incarcerated in the same cellblock as Ivory. Ivory told Mallett that he had ambushed a man sitting in a car and shot him, and then threw the handgun on a roof. Ivory explained that

"the guy that got shot was dating his sister and that he used to beat on his sister." *Id.* at 163.

[34] Prior to trial, Ivory moved to exclude the State's DNA evidence. The court held an evidentiary hearing and denied Ivory's motion.

[35] The court presided over a jury trial beginning on September 20, 2017, but that proceeding ended in a mistrial. The court presided over a second trial on August 27 through 31, 2018. The jury determined Ivory was guilty as charged. The court subsequently imposed a sentence, and this appeal followed.

# Discussion and Decision

## I. Sufficiency of the Evidence

[36] Ivory does not dispute that Smallwood was murdered. He instead claims the State failed to prove beyond a reasonable doubt that he was the shooter.

[37] In reviewing a sufficiency of the evidence claim, this Court neither reweighs the evidence nor assesses the credibility of the witnesses. *Bruno v. State*, 774 N.E.2d 880, 882 (Ind. 2002). We instead look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Ferrell v. State*, 746 N.E.2d 48, 50 (Ind. 2001). To convict Ivory of murder as charged, the State was required to prove beyond a reasonable doubt that (1) Ivory (2) knowingly or intentionally (3) killed Smallwood. Ind. Code § 35-42-1-1.

[38] Although motive is not a necessary element of the offense of murder, Ivory had a strong motive to kill Smallwood: he believed Smallwood was to some degree responsible for his sister's death. Next, although Ivory initially told police that he was in Michigan when Smallwood was shot, at trial he conceded that he was in the neighborhood, within a block of Po Boys, at the time of the murder. His mobile phone data also revealed that he was in the area.

[39] According to a ShotSpotter device, the shooting occurred just after 3:07 p.m. A security camera recording shows Ivory emerging from between two houses, down the alley from Po Boys, near that time. He approached Williams and Davis and briefly spoke with them before going back between the houses for a short time. When Ivory reemerged, he left an item on Williams and Davis' porch before leaving the area, shirtless. When Williams and Davis approached their house, Davis found a t-shirt on the porch, which Williams placed in the trash. Later, officers found a handgun in the gutter of the house. The handgun had been used to kill Smallwood.

[40] Subsequent testing of the t-shirt and the handgun revealed that Ivory contributed genetic material to the DNA that was found on those items. The handgun was registered to Ivory's wife, who claimed she had sold it at a gun show in Fort Wayne before the murder. At trial, Ivory admitted that it was "a pretty big coincidence" that his wife had owned the same gun that was used to kill Smallwood and had been discovered in the gutter of a house that Ivory had walked by right after the shooting. Tr. Vol. IV, p. 114.

Nichols, Gavin, Huey, and Mallett testified that Ivory had confessed to shooting Smallwood. Finally, during phone calls from jail, Ivory had stated, "guess you can't get away with everything." Tr. Ex. Vol., State's Ex. 300. In another call, he asked his wife to encourage witnesses to hide from the police so that they would not have to testify.

Ivory points to other evidence to argue: (1) he had stopped believing Smallwood was responsible for his sister's death prior to the murder; (2) none of the witnesses in the neighborhood identified him as the shooter; (3) all of the witnesses who said he confessed to them had credibility problems; (4) the STRmix DNA testing program is unreliable; and (5) another person was the shooter. These arguments are requests to reweigh the evidence, which our standard of review forbids. The State presented sufficient evidence to sustain Ivory's murder conviction.

## II. Admission of DNA Evidence

Ivory argues the trial court erred by admitting into evidence DNA test results related to the t-shirt and handgun, as described by forensic DNA analyst Shawn Stur. He claims the evidence was "confusing and misleading," in violation of Indiana Evidence Rule 403. Appellant's Br. p. 20. That rule provides: "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Ind. Evid. R. 403.

During trial, Ivory did not object to the DNA evidence under Rule 403. A failure to object when the evidence is introduced at trial waives the issue for appeal. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). A claim waived by a defendant's failure to raise a contemporaneous objection can be addressed on appeal if the reviewing court determines that a fundamental error occurred. *Id.*

The fundamental error exception to the waiver rule is "extremely narrow." *Benson v. State*, 762 N.E.2d 748, 755 (Ind. 2002). It applies only to "errors that are so blatant that the trial judge should have taken action sua sponte." *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014). Stated differently, "[t]he doctrine of fundamental error is available only in egregious circumstances." *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003).

Ivory notes that the STRmix software program is relatively new, and he further claims the results in this case were of low statistical value and would confuse the jury. We disagree. The age of a DNA analytical procedure is not, itself, a reason to exclude evidence. *See, e.g.*, *Alcantar v. State*, 70 N.E.3d 353, 358 (Ind. Ct. App. 2016) (no error in admitting evidence of DNA analysis used since 1996; State presented evidence that analysis was scientifically reliable).

Further, Stur explained for the jury the basic steps of the DNA profiling process and how the STRmix program works within that process. She also described how the Lab educated and trained analysts on the program, and the steps she takes to avoid contaminating samples during the comparison process. Finally, Stur explained the Lab's verbal scale to help jurors understand the Lab's level of

confidence in the test results. There is ample evidence to support a conclusion that the probative value of DNA evidence outweighed any confusion or undue prejudice.

[48] In any event, even if the DNA evidence should not have been admitted, the error was at worst harmless rather than fundamental. The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt sufficient to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Bonner v. State*, 650 N.E.2d 1139, 1141 (Ind. 1995).

[49] The State presented ample evidence of Ivory's guilt above and beyond the DNA results. Four people testified that Ivory admitted to killing Smallwood. There is no dispute that Ivory was within a block of Po Boys at the time of the shooting, and he had a deep grudge against Smallwood. The murder weapon was last registered in his wife's name, and the police found it in a gutter near where Ivory had walked just after the shooting. In addition, a security camera recorded Ivory walking away from the scene, shirtless, after discarding his shirt on Williams and Davis' front porch. Finally, during recorded telephone calls from jail he made incriminating remarks and asked his wife to encourage witnesses not to testify. This is substantial independent evidence sufficient to sustain a murder conviction beyond a reasonable doubt, and there is not a substantial likelihood that the admission of the DNA evidence, if erroneous, contributed to the guilty verdict.

# III. Jury Instructions

[50] Ivory argues the trial court committed several errors in the course of instructing the jury. He concedes that he did not object at trial to any of the jury instructions he challenges on appeal. As a result, his claims are waived on appeal unless he establishes that the trial court's decisions "constituted fundamental error." *Ford v. State*, 704 N.E.2d 457, 461 (Ind. 1998); *see also* Indiana Rule of Criminal Procedure 8(B) ("No error with respect to the giving of instructions shall be available . . . on appeal, except upon the specific objections made . . . ."). The standard for fundamental error is set forth above.

[51] Ivory first challenges the following final jury instruction:

> Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact.
>
> Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.
>
> It is not necessary that facts be proved by direct evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. A conviction may be based solely on circumstantial evidence.

Appellant's App. Vol. III, p. 9.

[52] Ivory notes the instruction deviates from Indiana's pattern jury instruction, which provides:

The parties in this case may prove a fact by one of two types of evidence—direct evidence or circumstantial evidence.

Direct evidence is direct proof of a fact. Circumstantial evidence is indirect proof of a fact.

For example, direct evidence that an animal ran in the snow might be the testimony of someone who actually saw the animal run in the snow. On the other hand, circumstantial evidence that an animal ran in the snow might be the testimony of someone who only saw the animal's tracks in the snow.

It is not necessary that any fact be proved by direct evidence. You may consider both direct evidence and circumstantial evidence as proof.

2. Ind. Judges Ass'n, Ind. Pattern Jury Instructions-Criminal 12.01 (Matthew Bender 2019).

[53] The preferred practice is to use pattern jury instructions. *Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005), *trans. denied*. But "pattern jury instructions are not always upheld as correct statements of law." *Boney v. State*, 880 N.E.2d 279, 294 (Ind. Ct. App. 2008). *trans. denied.* Ivory does not argue that the trial court's instruction, standing alone, misstated the law. The instruction in this case defines direct and circumstantial evidence similarly to the pattern instruction. We decline to find fundamental error in the giving of the instruction.

[54] Next, Ivory argues the trial court erred in failing to instruct the jury on the doctrine of the "reasonable theory of innocence." Appellant's Br. p. 26. He

cites the Indiana pattern jury instruction on burden of proof, which provides, in relevant part: "In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence." 2 Ind. Judges Ass'n, Ind. Pattern Jury Instructions-Criminal 13.1.

[55] The Indiana Supreme Court has determined that the jury should be instructed on the "reasonable theory of innocence" when the "defendant's conduct required for the commission of a charged offense . . . is established exclusively by circumstantial evidence." *Hampton v. State*, 961 N.E.2d 480, 491 (Ind. 2012). "Distinguishing between direct and circumstantial evidence as proof of a particular fact is a legal determination appropriate for judicial evaluation. It may require intricate legal analysis." *Id.* at 489. A defendant's confession of guilt to another person is direct evidence. *Carr v. State*, 728 N.E.2d 125, 131 (Ind. 2000).

[56] In this case, the State did not present a purely circumstantial case. Instead, the State provided testimony from Gavin, Nichols, Huey, and Mallett, all of whom stated that Ivory had confessed that he had shot a man outside Po Boys. As a result, the trial court was not obligated to instruct the jury on the "reasonable theory of evidence," and Ivory has failed to establish fundamental error.

## Conclusion

[57] For the reasons stated above, we affirm the judgment of the trial court.

[58] Affirmed.

Bradford, C.J., and Riley, J., concur.